FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 21 2026 ★
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

KYUNG L. TROTTER,

Plaintiff,

-v-

COMMUNITY DEVELOPMENT CORPORATION OF LONG ISLAND INC., a.k.a. COMMUNITY DEVELOPMENT LONG ISLAND
SEVEN TIER, LP, a.k.a. CRAIG RUBENSTEIN
LESLIE BARRY,
JOHN MANGINO,
DELORES PHRANER,
WILMA HAYES,

Defendants.

-----------------------------------------------------------x

Case No. CV 26 2371
(To be assigned by Clerk)

**ORDER TO SHOW CAUSE WITH TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

RECEIVED
APR 21 2026
EDNY PRO SE OFFICE

BULSARA, J.

LINDSAY, M.J.

REC'D IN PRO SE OFFICE
APR 21 '26 PM4:42

Upon the affidavit/declaration of Plaintiff Kyung L. Trotter, sworn to on______________, the accompanying Complaint, the Memorandum of Law, the exhibits annexed thereto, and all prior pleadings and proceedings herein;

LET DEFENDANT John Mangino, SHOW CAUSE before this Court at____________, __________, in Part [__], Courtroom [______], or such other time and place as the Court may direct, why an order should not be made and entered pursuant to Fed. R. Civ. P. 65:

1. granting a temporary restraining order and preliminary injunction enjoining Defendant Mangino, their agents, servants, employees, attorneys, and all persons acting in concert with them from executing, enforcing, or otherwise carrying out any eviction, holdover writ, removal,

or physical dispossess of Plaintiff from the premises located at 374 Donald Blvd, Holbrook, NY 11741, pending final determination of this action;

2. staying any state-court eviction or dispossessory process against Plaintiff while this federal action remains pending;

3. enjoining Defendant Mangino from treating Plaintiff's tenancy as subject to a nonrenewal or month-to-month regime in a manner that would result in Plaintiff's removal during the pendency of this action;

4. granting such other and further relief as the Court deems just and proper.

IT IS FURTHER ORDERED that, pending the hearing of this Order to Show Cause, Defendants and all persons acting in concert with them shall be temporarily restrained and enjoined from taking any steps to execute, enforce, or carry out Plaintiff's eviction or physical removal from the premises, as such would result in irreparable harm to the Plaintiff.

IT IS FURTHER ORDERED that service of this Order to Show Cause, together with the papers upon which it is granted, shall be made upon Defendant Mangino

by__________________________ on or before________________________.

IT IS FURTHER ORDERED that Defendant Mangino shall serve and file their opposition papers by __________________________, and Plaintiff shall serve and file any reply papers by ________________________.

IT IS FURTHER ORDERED that Plaintiff's request for emergency relief is granted to the extent of the temporary restraints set forth above, without prejudice to Defendant's right to seek modification or dissolution upon proper application.

SO ORDERED.

Dated: ______________________________

______________________________

UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

KYUNG L. TROTTER,

Plaintiff,

-v-

COMMUNITY DEVELOPMENT CORPORATION OF LONG ISLAND INC., a.k.a. COMMUNITY DEVELOPMENT LONG ISLAND
SEVEN TIER, LP, a.k.a. CRAIG RUBENSTEIN
LESLIE BARRY,
JOHN MANGINO,
DELORES PHRANER,
WILMA HAYES,

Defendants.

-----------------------------------------------------------x

Case No. ________________
(To be assigned by Clerk)

**AFFIDAVIT/DECLARATION IN SUPPORT OF ORDER TO SHOW CAUSE**

1. I Kyung L. Trotter, am the Plaintiff in this action and a competent adult. I make this declaration in support of my Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction as follows:

2. I am a participant of the Housing Choice Voucher program.

3. My landlord is John Mangino, who is also a defendant named in my 42 U.S.C. §1983 filed in this court.

4. Defendant Mangino is pursuing a holdover/eviction process against me based on an asserted, mere nonrenewal and/or month-to-month theory, as opposed to the federal requirements that he show grounds for good cause before terminating my tenancy.

5. Although Plaintiff filed a Motion to Dismiss in the proceeding, the eviction Court has been deliberating the same since April 2, 2026.

6. Should the eviction Court deny the Plaintiff's motion, the case will immediately go to trial, which in a summary proceeding is little more than a swift hearing.

7. Thus, I face a threat of imminent eviction, homelessness and a termination of my Housing Choice Voucher, because of the eviction.

8. In addition, I do not have an adequate opportunity to raise my federal claims in the state forum.

9. In my sworn complaint, I raise the question whether the policy, custom, practice or usage of the Community Development Corporation of Long Island, Inc. (CDCLI), serves as a and enables landlords to bypass procedural due process protections, before the landlord may terminate a tenancy.

10. Even if the Court ultimately answers in the affirmative in my favor, it will be too late to stop Defendant Mangino from evicting me from my home, with my children.

11. If the state proceeding is not stayed while this 42 U.S.C. §1983 is pending before this Court, I will suffer irreparable harm, which cannot be compensated monetarily.

12. Subsequently I do not have an adequate opportunity to raise my federal claims in the state forum.

13. Pursuant to Fed. R. Civ. P. 65(b)(1)(B), I certify that on April 21, 2026, at 1:38 pm I provided notice of this application to Defendant Mangino's counsel for the summary eviction, Thomas S Zawyrucha, by phone at (631) 227-3435 and (631) 948-5731.

14. A formal hearing should not be required prior to the issuance of this TRO because the state Court has been deliberating on a dispositive motion since April 2, 2026. A decision and a resulting eviction warrant could be issued at any moment.

15. Because an eviction constitutes irreparable harm, this Court must act immediately to stay the state proceedings before a warrant is executed, as the delay required for a noticed hearing would effectively moot the relief sought.

Respectfully submitted,


KYUNG L. TROTTER
Plaintiff, Pro Se
374 Donald Blvd
Holbrook, NY 11741
(631) 202-7887
Trotter.Kyung@yahoo.com


Sworn before me this 21st day of April, 2026:

Notary Public

Adrian A. Aragundi
Notary Public, State of New York
No. 01AR6435316, Suffolk County
Commission Expires June 21, 2026

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x

KYUNG L. TROTTER,

Plaintiff,

-v-

COMMUNITY DEVELOPMENT CORPORATION OF LONG ISLAND INC., a.k.a. COMMUNITY DEVELOPMENT LONG ISLAND
SEVEN TIER, LP, a.k.a. CRAIG RUBENSTEIN
LESLIE BARRY,
JOHN MANGINO,
DELORES PHRANER,
WILMA HAYES,

Defendants.

-----------------------------------------------------------x

Case No. ________________

**MEMORANDUM OF SUPPORT OF ORDER TO SHOW CAUSE**

**Preliminary Statement**

Plaintiff seeks a Temporary Restraining Order (TRO) and a Preliminary Injunction (PI) to stop an imminent eviction and preserve the status quo while the Court decides federal claims.

The state forum has not provided and cannot provide a meaningful opportunity to the Plaintiff to protect her constitutional rights.

A federal court may enjoin a pending state summary holdover proceeding where the plaintiff shows (1) irreparable harm, (2) a serious question going to the merits to make them a fair ground for trial and (3) a balance of hardships tipping decidedly in the plaintiff's favor.

**Argument**

## I. Irreparable Harm

As a general matter, courts have held that the "threat of eviction and the realistic prospect of homelessness constitute a threat of irreparable harm and satisfy the first prong of the test for preliminary injunctive relief. *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 328 (E.D.N.Y. 2012). Plaintiff will suffer irreparable harm if a preliminary injunction is not granted, as summary eviction will result in the loss of her home and possibly the loss of her voucher. Whether she gets to keep her voucher is up to the discretion of the same Defendants name in this case and the same Defendants whose custom or usage caused the Plaintiff to be deprived her right to procedural process.

## II. Serious Question Going to the Merits Were Raised

Plaintiff has, at minimum, raised sufficiently serious questions going to the merits to make them a fair ground for litigation. Specifically, this action presents the substantial question of whether CDCLI's policy, custom, or usage enables landlords, specifically in this case, Defendant Mangino, to bypass procedural due process rights provided by 42 U.S.C. §1437f and 24 C.F.R. §982, for tenants, before terminations of tenancy and instead evict tenants at will.

The record reflects that Defendant initiated and continues to prosecute eviction proceedings against the Plaintiff, in the absence of the federally required procedural protections governing Housing Choice Voucher program tenancies, including adequate notice and compliance with program conditions that regulate termination of tenancy. At a minimum, these facts raise a substantial question as to whether Defendant's conduct deprives Plaintiff of a protected property interest in continued occupancy without due process of law.

Accordingly, Plaintiff has satisfied the "serious questions" standard warranting preliminary injunctive relief.

### III. <u>Balance of Equities</u>

If a TRO and preliminary is not granted to the Plaintiff, she could be evicted from her home. In addition, whether she continues to receive her housing benefit will be left up to the discretion of the very same parties in this instant case. Such also not only places her in imminent danger of immediate homelessness, but permanent homelessness without no way to fund another place to live with her children.

On the other hand, Defendant Mangino would only be subject to maintaining a tenancy which he merely just does want to maintain. In addition, if the Plaintiff were to be evicted, Mangino could easily replace her with a tenant.

Thus, the hardship tips sharply in the Plaintiff's favor.

### IV. <u>Anti Injunction Act</u>

"The three excepted circumstances are (i) the express provisions of another act of Congress authorizing such an order; (ii) necessity in aid of the federal court's jurisdiction and (iii) the need to protect or effectuate the federal court's judgments." *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 317 (E.D.N.Y. 2012).

A federal court properly acts "in aid of its jurisdiction" where enjoining state proceedings is "necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." *Atl. Coast Line,* 398 U.S. at 295, 90 S.Ct. 1739; *see also Bess v. Spitzer,* 459 F.Supp.2d 191, 202 (E.D.N.Y.2007) *Sinisgallo v. Town of Islip Hous. Auth.,* 865 F. Supp. 2d 307, 317–18 (E.D.N.Y. 2012)

Courts have held that this second exception is applicable when a plaintiff cannot present his or her federal claims in the state court eviction proceeding. *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 318 (E.D.N.Y. 2012).

For example, in *McNeill v. New York City Housing Authority,* 719 F.Supp. 233, 256 (S.D.N.Y.1989) the plaintiffs alleged that the New York City Housing Authority's ("NYCHA") procedures for terminating their Section 8 benefits violated their constitutional right to due process and their rights under the United States Housing Act and federal HUD regulations. Although the plaintiffs received their Section 8 benefits from the NYCHA, their leases were with private landlords. As a result, when the NYCHA terminated their Section 8 benefits and they were no longer able to pay their rent, the private landlords commenced eviction proceedings against the plaintiffs. The court held that the "in aid of jurisdiction" to the Anti–Injunction Act applied, reasoning that:

Unless eviction proceedings are stayed long enough to adjudicate Plaintiffs' alleged right to retroactive reinstatement in the Section 8 program, plaintiffs will be evicted before this case can be decided. In this event, the Court will be unable to accord meaningful relief to the parties. Reinstatement in Section 8 without an apartment would be tantamount to no relief at all. Similarly, a change in NYCHA's Section 8 termination policies and practices would mean little to plaintiffs who have already lost their apartments. Preliminary injunctive relief thus is essential to aid this Court's ability to decide the claims and accord the appropriate relief. *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307, 318 (E.D.N.Y. 2012)

Plaintiff's circumstances are analogous to McNeill, supra. CDCLI's policy, custom or usage, supplanted the Plaintiff's due process protections which would have attached, had it followed 42 USC §1437 and 24 CFR §982 and ensured that she had a written renewed lease, tenancy addendum and coterminous hap contract framework. This structure causes protections to attach such as notice, a meaningful opportunity to be heard, and a requirement that a landlord show good cause before terminating a tenancy. Because CDCLI's policy, custom or usage stripped the Plaintiff of her lease and said structure, Defendant Mangino was able to file a summary eviction, merely claiming that she was a holdover. Thus, CDCLI's actions deprived the Plaintiff of her constitutional right to due process.

Unless the Plaintiff's eviction proceedings are stayed long enough to adjudicate whether CDCLI's custom or usage, by way of stripping her of her lease and protections, enabled Defendant Mangino to purportedly terminate her tenancy, Plaintiff will be evicted before this case may be decided. In this event, this Court, as in Sinigallo, will not be able to accord the Plaintiff meaningful relief. A finding that CDCLI's policy, custom or usage stripped the Plaintiff of her lease and due process protections, leaving her exposed to a mere holdover eviction, could not bring relief as the Plaintiff will have already lost her home.

## V. <u>Younger Abstention- More Theoretical Than Real</u>

The adequacy of the summary eviction court to provide an adequate forum for relief is more theoretical than real, in that a summary eviction presents a procedural barrier and Defendant Mangino brought the eviction in bad faith.

### 1. **The Procedural Barrier**

Eviction cases in New York District Courts are "summary proceedings." They are designed for speed, not for complex constitutional litigation. The speed of the process prevents the Plaintiff from actually litigating her Fourteenth Amendment Due Process claim or her Section 1983 theories.

## VI. <u>Federal Court May Interfere Where Due Process Has Been Deprived</u>

"It is well to repeat at the outset that the Civil Rights Act does not empower a federal judge to interfere with a 'state' landlord's decision not to renew a lease simply because he thinks the decision harsh or unwise; he is authorized to do this only if the tenant has been deprived of due process of law". *Sinisgallo,* 865 F. Supp. 2d at 322.

Plaintiff's allegations fit squarely into this reasoning. Plaintiff's lease expired in January, 2024 as alleged in her complaint. She further alleges that Defendant Mangino engaged in a scheme which deprived her of a statutorily and regulatorily required lease renewal and he was only able to file the summary eviction, because such scheme also enabled him to bypass federally adequate notice of termination and the state pleading requirements. Thus, the Court may interfere with the state proceeding as such was initiated by way of deprivation of the Plaintiff's procedural due process rights.

## VII. <u>The requested relief is prospective and proper</u>

Plaintiff does not ask this Court to sit in review of a final state judgment. Plaintiff asks only for prospective equitable relief to prevent ongoing deprivation while this federal case proceeds.

**Conclusion**

For these reasons, Plaintiff respectfully requests that the Court sign the Order to Show Cause, issue temporary restraints immediately, and schedule an expedited hearing on the preliminary injunction.

Respectfully submitted,

KYUNG L. TROTTER
Plaintiff, Pro Se
374 Donald Blvd
Holbrook, NY 11741
(631) 202-7887
Trotter.Kyung@yahoo.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------------------x

KYUNG L. TROTTER,

Plaintiff,

-v-

COMMUNITY DEVELOPMENT CORPORATION OF LONG ISLAND, INC.,
SEVEN TIER, L.P., a.k.a. CRAIG RUBENSTEIN
LESLIE BARRY,
JOHN MANGINO,
DELORES PHRANER,
WILMA HAYES,

Defendants

--------------------------------------------------------------------------x

Case No. ________________

**COMPLAINT**

**JURY TRIAL DEMANDED**

## INTRODUCTORY STATEMENT

Congress makes its intent clear in the very first line of 42 U.S.C. §1437f. It is to provide the low income tenant with a "decent" place to live. The Housing Quality Standards of the 24 CFR §982 ensure that a home for a low income tenant is decent, by setting standards which a landlord who participates in the program must follow, to receive rent payments and even to continue to participate in the program. CDCLI makes a landlord's compliance with this standard which brings Congress's intent to fruition, optional. If a tenant refuses to assume the HQS responsibility of the landlord, CDCLI's policy, custom or usage described hereinafter, provides a noncompliant landlord with a manufactured procedural avenue, to bypass due process and throw the tenant into the street, if the tenant reports that the landlord isn't maintaining a decent home for the tenant to live in.

Even worse, whereas Congress's intent is to provide a decent place for the tenant to live, CDCLI's custom has transformed the low income tenant from a person in such need that Congress had to step in, to a dispensable source of profit for it and the landlord. This was not Congress's intent. Plaintiff respectfully asks this Court to restore Congress's benevolent intent.

Plaintiff Kyung L. Trotter brings this action under 42 U.S.C. § 1983 to vindicate her federal right to procedural due process under the Fourteenth Amendment. Defendants, a local administrator of the Housing Choice Voucher program Community Development Center Long Island (CDCLI), two private landlords (Seven Tier, L.P. and John Mangino), and CDCLI employees (Leslie Barry, Delores Phraner and Wilma Hayes) acting jointly and in a symbiotic relationship, deprived Plaintiff of a federally protected property interest in her government benefit and leasehold, by permitting HAP payments to continue absent written leases, accepting defective termination notices that omitted required allegations of good cause for Section 8 tenants, and by otherwise enabling eviction without constitutionally adequate process. The factual allegations supporting this Complaint are drawn from Plaintiff's records and communications, including the draft pleading and exhibits.

**JURISDICTION AND VENUE**

1. This Court has subject-matter jurisdiction under 28 U.S.C. § 1343(3) (civil rights) and 28 U.S.C. § 1331 (federal question), as Plaintiff alleges deprivation of rights secured by the Constitution, federal statute and regulation (42 U.S.C. § 1983; 42 U.S.C. § 1437f and implementing regulation 24 CFR §982).
2. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) as the events giving rise to the claims occurred in Suffolk County, New York, within this district.

## PARTIES

3. Plaintiff Kyung L. Trotter, tenant of 374 Donald Blvd, Holbrook, NY 11741, and a participant in the Federal Housing Choice Voucher (HCV) program administered locally by Defendant CDCLI.

4. Defendant COMMUNITY DEVELOPMENT CORPORATION LONG ISLAND (CDCLI), located at 1660 Walt Whitman Rd # 130, Melville, NY 11747, is a Housing Development Corporation responsible for administering the HCV program in Suffolk and Nassau County. The New York State Department of Housing and Community Renewal (DHCR), is NY state's affordable housing agency. Its subsidiary is the Housing Trust Fund Corp. (HTFC), which is a public benefit corporation and Public Housing Authority (PHA). HTFC receives federal funds from the U.S. Department of Housing and Urban Development (HUD), to administer the Housing Choice Voucher (HCV) program. HTFC subcontracts to CDCLI, to administer the HCV program on its behalf, delegating its State authority to CDCLI, to administer the program in Suffolk and Nassau County, NY.

5. CDCLI, on behalf of HTFC, performs such functions traditionally the exclusive prerogative of the State, including: lease approval, execution and administration of Housing Assistance Payment (HAP) contracts, regulatory enforcement, tenant eligibility determinations, termination from the program, and oversight of termination of tenancy procedures.

6. CDCLI acts under color of state law as it exercises authority delegated by HTFC and performs a public function. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982). *Marsh v. Alabama*, 326 U.S. 501, 506 (1946).

7. CDCLI is sued in its official capacity.

8. SEVEN TIER, L.P. is a limited partnership and landlord, located at 258 Granny Road, Medford, NY, 11763, who owns the residential property located at 448 Donald Blvd, Holbrook, NY 11741.

9. Seven Tier acted under color of state law by willfully participating in joint activity with CDCLI and its agents, including Defendant Barry, in the administration of Plaintiff's HCV tenancy, including: failing to offer lease renewals, failing to certify that it had complied with 42 U.S.C. §1437f and 24 CFR §982, receiving HAP payments contingent on compliance with said statute and regulation and utilizing CDCLI's practices to effectuate termination, without good cause.

10. Accordingly, Seven Tier's conduct is fairly attributable to the State under *Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982).*

11. Seven Tier is sued in its individual capacity.

12. Defendant JOHN MANGINO is a private landlord, located at 9 Heather Crescent, Commack, NY 11725, who owns or manages the residential property located at 374 Donald Blvd, Holbrook, NY 11741.

13. Mangino acted under color of state law by willfully participating in joint activity with CDCLI and its agents, including Defendant Phraner, in the administration of Plaintiff's HCV tenancy, including: failing to offer lease renewals, failing to certify that he had complied with 42 U.S.C. §1437f and 24 CFR §982, receiving HAP payments contingent on compliance with said statute and regulation and utilizing CDCLI's practices to effectuate termination, without good cause.

14. Mangino's conduct is therefore fairly attributable to the State under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

15. Defendant LESLIE BARRY was a CDCLI Housing Specialist located at 1660 Walt Whitman Rd # 130, Melville, NY 11747, assigned to Plaintiff's tenancy at 448 Donald Blvd, Holbrook, NY 11741.

16. Barry's duties included: receiving and reviewing leases, ensuring compliance with 24 C.F.R. §982, conducting recertifications and enforcing regulatory requirements, *inter alia.*

17. Barry is sued in her official capacity.

18. Defendant DELORES PHRANER was a CDCLI Housing Specialist, located at 1660 Walt Whitman Rd # 130, Melville, NY 11747, assigned to Plaintiff's tenancy at 374 Donald Blvd, Holbrook, NY 11741.

19. Phraner's duties included: receiving and reviewing leases, ensuring compliance with 24 C.F.R. § 982, conducting recertifications and enforcing regulatory requirements, *inter alia.*

20. Phraner is sued in her official capacity.

21. Defendant WILMA HAYES is the Assistant Director of CDCLI, located at 1660 Walt Whitman Rd # 130, Melville, NY 11747, and a final policymaker.

22. Hayes: reviewed Plaintiff's complaints, ratified CDCLI's practices and exercised supervisory authority over program administration.

## STATUTORY AND REGULATORY FRAMEWORK OF THE HCV PROGRAM

### Landlord Duty to Form the Tenancy Structure

23. Plaintiff hereby incorporates and realleges paragraphs 1 through 22 as if fully set forth herein.

24. The form of the Section 8 tenancy structure, upon which a landlord may be paid, consists of two contracts: the lease between the landlord and tenant and the HAP contract between the Local Administrator (LA) and the landlord.

25. The provisions 42 U.S.C.A. § 1437f.(o)(7)A. and 24 CFR §§982.308(b)(1); 308(f)(2) taken together, state that the landlord must enter into a written lease with the tenant, for not less than 1 year, attach the Tenancy Addendum (TA) to the lease or, if it is a standard lease that he uses with unregulated tenants, such must contain the words of the Tenancy Addendum, word for word.

26. The lease must also include an explicit clause for renewal.

27. The landlord must certify on his HAP contract, that he has complied with all the legal requirements of said contract.

28. When the landlord certifies his HAP contract, he is also affirming that he is in compliance with the Housing Quality Standards (HQS).

29. Unless the landlord has complied with the legal requirements, pursuant to 42 U.S.C.A. § 1437f.(o)(7)A. and 24 CFR §982.308(b)(1), the landlord has no right to receive housing assistance payments under the HAP contract.

**The LA Duties to Form the Tenancy Structure**

30. Plaintiff hereby incorporates and realleges paragraphs 1 through 29 as if fully set forth herein.

31. The LA must use its best efforts to execute the HAP contract within 60 days of the beginning of the lease term. While this subsection also states that the PHA "must use best efforts to execute the HAP contract *before the beginning* of the lease term", this conflicts with 24 C.F.R. 982.309(b)(1), which states that the HAP contract begins on the first day

of the lease term, and ends on the last day of the lease term. Moreover, once the HAP contract is executed within the required 60 days, the landlord is only paid for up to 60 days from the beginning of the lease term.

32. The regulation does not explicitly state that the LA must physically check that the tenant has a written lease and a Tenancy Addendum, or a lease with the word for word verbiage of the Tenancy Addendum. However, the LA is the entity to which the landlord is certifying that he has complied. Thus, direct verification is implied.

33. The LA may not pay the landlord until the HAP contract has been executed, complete with the landlord's certification that he has complied with the statutory and regulatory requirements.

34. Subsequently, if this structure of:

- a written lease with the tenant, for not less than 1 year,
- the Tenancy Addendum attached to the lease or,
- if not, and the lease is a standard that the landlord uses with unregulated tenants, it must contain the words of the TA, word for word,
- an explicit clause for renewal,
- The landlord's certification on his HAP contract that he has complied with all the requirements, and
- an executed HAP contract coterminous with the lease,

is not established and in place, then the LA may not pay the landlord.

**Termination of the Tenancy- The LA**

35. Aside from the tenant moving from the home, there are only two ways to terminate the tenancy and two parties that may do so. The first is the LA.

36. There is no such provision statutorily or otherwise, that allows the LA to terminate a lease alone. To terminate a lease, it must terminate the subsidy that pays the landlord itself, and remove the tenant from the HCV program.

37. To remove the tenant from the program, it must provide the tenant with a hearing. It is only by this procedure that the LA may eliminate a lease.

**Termination of the Tenancy- The Landlord**

38. The second way is the landlord may terminate the tenancy. However, to do so, the landlord must serve the tenant notice, asserting grounds for good cause. 42 U.S.C.A. §§ 1437f.(d)(1)(B)(iv) and (o)(7)(C); 24 C.F.R. §982.310(e)(2)(i) and 42 U.S.C.A. §1437f.(d)(1)(B)(ii), TA form HUD-52641-A ¶ 8.

39. Only then may the landlord proceed to file an eviction in court. However, the landlord must plead grounds for good cause there as well.

40. Indeed, the landlord must disclose all the material facts of the case under RPAPL §741, including the fact that the tenant is an HCV beneficiary.

## CDCLI'S "MONTH TO MONTH" CUSTOM, PRACTICE, OR USAGE

41. Plaintiff hereby incorporates and realleges paragraphs 1 through 40 as if fully set forth herein.

42. CDCLI has a custom, practice or usage (custom) which eliminates both processes.

43. This custom consists of treating HCV tenancies as automatically transforming into month-to-month, after the expiration of the first, one-year term, and eliminating the required written lease renewals.

44. Said lease renewals pursuant to the 42 U.S.C. §1437f and 24 CFR §982 shall be written, not less than one year, with renewed HAP contracts, coterminous with the renewal terms.

45. CDCLI's custom is implemented by eliminating said procedures which secure this framework and supplanting its unofficial custom of automatic month to month tenancy, in its place.

46. It implements this custom annually during the tenant's recertification of eligibility for her benefit. During recertification it conducts an inspection of the premises.

47. If it finds that the home meets the HQS then it is obligated to reestablish a renewed framework, including utilizing the HUD form 52461, which is the HAP contract, the form 52461-A, which is the Tenancy Addendum and a written lease, as prescribed in 24 C.F.R. §982.162.

48. The Tenancy Addendum is quite literally the placement of the tenant's rights which may be enforced against the landlord, into the tenant's hand, to make him or her aware of the due process protections that attach, when this framework is followed by the PHA- in this case CDCLI. Having these rights placed into the tenant's hand is so important to HUD, that the verbiage of the same must be word-for-word in the lease and such verbiage is also included in the HAP contract.

49. CDCLI does not adhere to the federally required framework. According to CDCLI it can just issue a document titled "Housing Choice Voucher Program Contract and Tenancy Addendum Amendment" the (Purported Amendment). (See Exhibit 1).

50. These documents purport to continue the expired HAP contract and Tenancy Addendum from the first year of the compliant tenancy, without execution of a new written lease,

despite the requirements of 42 U.S.C.A. § 1437f.(o)(7)A, 24 C.F.R. §§ 982.308, 309 and 162.

51. These documents are issued on CDCLI letterhead and signed by supervisory officials, including an Assistant Director and a Vice President of Rental Assistance.

52. Through this practice, CDCLI can continue paying the landlord HAP payments in the absence of a legally compliant tenancy, and evade the due process protections that would attach for the tenant, if such framework was lawfully established.

53. Because the tenant is left with no written lease to show that she has a right to remain in her home, this practice simultaneously permits the landlord to evict the tenant as a "holdover", under state law only, as opposed to the federal mandate to show good cause, before the landlord may terminate the tenancy.

54. If the tenant could show her lease as proof of her status as an HCV beneficiary, the landlord would have to serve notice containing the grounds for good cause to remove her.

55. The landlord would also have to plead those same grounds in an eviction petition, complying with the requirements of 42 U.S.C.A. §§ 1437f.(d)(1)(B)(iv) and (o)(7)(C) and 24 C.F.R. § 982.310(e)(2)(i).

56. CDCLI' s custom alleviates the landlord of both due process requirements.

57. The custom allows the landlord to continue to get paid and the PHA to continue receiving administrative fees to manage the tenant's benefit, while leaving the tenant vulnerable to an eviction at will.

58. In addition, CDCLI abandoning those required conditions, deprives the tenant of the voucher benefit itself, in its lawful form, a form which allows due process protections to attach.

59. CDCLI may not place the tenant in the practical position she would be in had it terminated her voucher with a hearing, indirectly, what it cannot lawfully achieve directly.

60. This custom was implemented by CDCLI employees, including Defendants Barry, Phraner and supervisors who signed the purported amendments against the Plaintiff for the years 2018, 2019, 2020, 2021, 2022, 2024, 2025 and 2026. (See Exhibit 1 as to supervisors).

61. CDCLI in 2008, also issued new HCV beneficiaries a handbook, which explicitly stated that the statuses of their tenancies automatically convert to month to month. (See Exhibit 2).

## FACTUAL ALLEGATIONS

## I. TENANCY AT 448 DONALD BLVD (DEFENDANT SEVEN TIER)

### Formation of the Tenancy

62. Plaintiff hereby incorporates and realleges paragraphs 1 through 61 as if fully set forth herein.

63. On or about Dec 1, 2017, Plaintiff, Kyung Trotter (Plaintiff) moved into 448 Donald Blvd, Holbrook, NY 11741 (the 448 Home), owned by Seven Tier, LP.

64. Plaintiff and Seven Tier entered into a written lease for a duration of 1 year. Seven Tier and CDCLI executed a HAP contract coterminous with the lease term. Plaintiff received a Tenancy Addendum.

65. Seven Tier included a clause in its lease that Plaintiff would "peacefully surrender" the premises at the end of the lease term, instead of the required lease renewal clause, pursuant to 24 C.F.R. § 982.308(d)(3).

**Failure to Renew Leases**

66. Said lease expired on November 30, 2018.

67. Seven Tier did not offer Plaintiff a renewal lease for December 2018 to on or about March 2019.

68. Seven Tier did not offer Plaintiff leases renewals for 2020, 2021, or 2022.

69. For approximately four years, no written lease renewals, TAs, or coterminous HAP contracts existed to establish what should have been a compliant, protective tenancy for the Plaintiff.

**No Certifications**

70. Seven Tier did not certify on a renewed HAP contract that it had executed new leases between it and the Plaintiff for the aforesaid years.

**Rent Increases Without Lease or Agreement**

71. During annual recertifications of the benefit, Defendant Barry stepped into the shoes of the Plaintiff and agreed to Seven Tier's increases in the rent on or about March 1, 2021 from $2,082 to $2,368, and on or about December 1, 2022, from $2,368 to $2,485.

72. By the time the Plaintiff moved out of the 448 home, her portion of the rent had changed from $734 to $1,042 for a total of a $403 increase, without her agreement.

73. Barry then continued processing HAP payments for Seven Tier, for approximately 48 months, including the rent increases for 2021 and 2022.

74. These actions violated the regulatory provisions set forth supra, including 42 U.S.C.A. § 1437f(o)(7)(A) and 24 C.F.R. §§ 982.308, 982.309, and 982.305.

75. During this same period, Barry issued the purported amendments.

**HQS Violations and Improper Delegation of Responsibilities**

76. The 2017-2018 lease stated:

"The Landlord shall maintain the dwelling unit and all equipment provided for-the use and-benefit of the Tenant in compliance with the Housing Quality Standards as defined in 24 CFR §982.401. The Landlord shall respond in a reasonable time to calls by the Tenant for Services consistent with this obligation."

77. On or about March 5, 2019, Seven Tier sent Plaintiff a text message informing her that it would cease any and all direct communication with her, for reasons not disclosed by Seven Tier to the Plaintiff.

78. Seven Tier provided Plaintiff with phone numbers for at least 3 of its contractors and ordered her to coordinate any future repairs for her home herself, directly with its contractors.

79. This conduct effectively shifted Seven Tier's obligations to comply with the Housing Quality Standards 24 C.F.R. §982.401 (at the time), onto Plaintiff for on or about 4 years.

**Plaintiff's Complaints and CDCLI's Response**

80. Plaintiff attempted to have Seven Tier resume its HQS responsibilities by sending a certified letter on February 15, 2022 explaining that coordinating maintenance was not her legal responsibility.

81. Seven Tier did not respond.

82. On May 4, 2022, Plaintiff complained to Defendant Barry via email.

83. Defendant Barry not only did nothing to rectify the issue, but she defended Seven Tier stating: "You do…have a point of contact…the point of contact works with the landlord directly." (See Exhibit 3).

84. She then shifts the blame for the HQS to the Plaintiff, claiming that she has "been made aware" that Seven Tier purportedly tried to work with the Plaintiff, referring to times which Seven Tier sent contractors to the Plaintiff's home on weekends, or after 5 p.m. on weekdays, without notice to or coordination with the Plaintiff and in violation of NY State law.

85. Barry minimized Seven Tier's failure to offer Plaintiff written lease renewals, which contained the clause of communication, by apologizing that "things [had] changed in the last two years".

86. Barry further admitted: "As you recertify with our program, we continue to renew our cont[r]act (the HAP contract) with the landlord."

87. She then stated: "You may withdraw from this program".

88. With respect to Seven Tier serving the notice which Barry accepted as adequate, on November 29, 2022 she stated: "…you may choose to pay your portion, you may vacate, you may stay and he will choose to go through the eviction process…this is all up to you as you are the head of the household." (See Exhibit 4).

89. Barry also stated that she was copying her supervisor on the email.

**Electrical Hazard Incident**

90. On or about April 19, 2022, Plaintiff smelled smoke in her kitchen and shut off power to the affected area.

91. Plaintiff's brother who lived with her at the time, texted Seven Tier and requested that it send an electrician.

92. Seven Tier instead sent its HVAC contractor.

93. The contractor came to the home and discovered that there was something loose in the panel box in the basement. He then told Plaintiff that he would inform Seven Tier that the problem was electrical and advise him to send an electrician.

94. Seven Tier did not send an electrician.

95. Plaintiff and her family left the home for that night out of fear that it would catch fire.

96. Upon return, Plaintiff had no heat or hot water due to the loss of power to the boiler.

**Municipal Intervention**

97. Plaintiff's brother texted Seven Tier several times but received no reply.

98. Plaintiff then contacted the town of Islip to report that she had no heat or hot water.

99. A municipal inspector came to the home, subsequently cited Seven Tier, and ordered it to restore the heat and hot water.

**Purported Notice to Terminate**

100. On or about August 19, 2022, Seven Tier served Plaintiff with a purported 90-day notice of termination of her tenancy.

101. The notice contained no grounds for good cause. It merely stated in part that: "the landlord …hereby elects not to renew your tenancy and further elects to terminate your tenancy as of November 30 2022…" (See Exhibit 5).

102. Seven Tier served the same notice upon CDCLI.

103. Defendant Barry accepted the notice as adequate.

104. On or about December 4, 2022, Seven Tier filed a summary eviction petition against Plaintiff under RPAPL §711, the state holdover statute.

105. The petition mentioned nothing of the Plaintiff's HCV status and nothing about her right to its showing of good cause because of that status, in violation of RPAPL §741.

**Result**

106. On or about January 29, 2023, Plaintiff was forced to flee her home with her children.

## II. TENANCY AT 374 DONALD BLVD (DEFENDANT MANGINO)

107. Plaintiff hereby incorporates and realleges paragraphs 1 through 106 as if fully set forth herein.

108. On or about February 1, 2023, Plaintiff moved into 374 Donald Blvd, Holbrook, New York, owned or managed by Defendant John Mangino. Plaintiff and Mangino entered into a written lease for a one-year term.

109. Mangino included a clause that stated that lease renewals would be for successive terms of one year.

110. Mangino also included a clause that stated that at the end of the term, Plaintiff would "peacefully surrender" the premises to him.

111. CDCLI executed a HAP contract with Mangino corresponding to that lease term.

**Failure to Renew Leases**

112. Said lease term expired on January 31, 2024.

113. Mangino did not offer Plaintiff written lease renewals for 2024, 2025 or 2026.

114. Mangino did not execute a renewed HAP contract with CDCLI, or certify that he had complied with the statute and regulation.

115. Defendant Phraner continued processing HAP payments for Mangino for approximately 22 months.

116. These actions violated 42 U.S.C.A. § 1437f(o)(7)(A) and 24 C.F.R. §§ 982.308, 982.309, and 982.305.

117. During this same period, Phraner issued the purported amendments.

**Improper Attempt to Shift Maintenance Obligations**

118. After Plaintiff moved into the property, Mangino asked Plaintiff to enter into a service contract with Traegor Fuel Supply, for maintenance of the boiler.

119. Mangino stated that he "didn't need to be getting phone calls at 3 a.m." regarding boiler issues.

120. Mangino repeatedly attempted to compel Plaintiff to enter this improper service contract, which would unlawfully shift boiler maintenance obligations to her, in violation of the HQS.

121. Plaintiff refused to enter into such a contract and informed Mangino that maintenance of the boiler was the landlord's responsibility.

**Escalation and Harassment**

122. Mangino responded with escalating hostility, including repeated accusatory texts, phone calls, and statements such as "Don't blame me for your life" and "you're being very difficult."

123. Mangino continued sending lengthy and hostile communications despite Plaintiff's repeated requests that he stop.

**Boiler Failure and Code Enforcement**

124. Mangino did not have the boiler cleaned or serviced in 2024 or 2025.

125. On or about August 11, 2025, the boiler failed for the third time.

126. Plaintiff notified Mangino.

127. Mangino sent a service person, but after the service person assessed the problem Mangino refused to fix the boiler.

128. At that point, Plaintiff contacted the Town of Islip Code Enforcement.

129. The Town inspector determined that there was no hot water and directed Mangino to repair the boiler.

130. Mangino refused to comply.

**Physical Confrontation and Continued Harassment**

131. On the same day, Mangino came to the Plaintiff's home and relentlessly pounded on the door, demanding that Plaintiff accept a "deal" for the service contract, or else she "had to go".

132. Mangino refused to leave until Plaintiff indicated she would call the police.

133. Plaintiff contacted law enforcement.

134. Mangino finally fled the premises.

135. Mangino immediately resumed sending hostile texts, including "I'm sorry, but you're leaving."

**Conditions of the Home**

136. As a result of Mangino's failure to repair the boiler, Plaintiff and her family were without hot water for approximately 5 days.

137. Plaintiff and her family were forced to stay in hotels or travel to relatives' homes for basic necessities, including bathing.

**CDCLI Inspection and Findings**

138. On or about August 15, 2025, Plaintiff reported Mangino to CDCLI.

139. On or about August 16, 2025, CDCLI conducted an inspection.

140. The inspector found Mangino at fault for the condition of the boiler.

141. Only after this finding did Mangino complete the necessary repairs.

**Purported Notice to Terminate**

142. On or about August 19, 2025, Mangino served Plaintiff with a purported 90- Day "Notice of Termination of Tenancy of Non-Regulated Residences". (See Exhibit 6).

143. The notice contained no grounds for good cause and explicitly asserted that Plaintiff had "no right to a showing of good cause".

144. Mangino served the same notice upon CDCLI.

145. Defendant Phraner accepted the notice as adequate.

146. On or about November 29, 2025, Mangino texted the Plaintiff that he was aware that Phraner had sent her a "Notice of Overhousing", while insisting that she vacate the premises by midnight the next day.

147. On or about January 9, 2026, Mangino filed a summary eviction to remove the Plaintiff, claiming that Plaintiff was a month-to-month tenant and a holdover. (See Exhibit 7).

**III. CDCLI CONDUCT- PHARNER (EMAIL ADMISSIONS)**

148. Plaintiff hereby incorporates and realleges paragraphs 1 through 147 as if fully set forth herein.

149. On August 27, 2025, Plaintiff informed Phraner that Mangino had been harassing her, including the police incident.

150. She also explained how Mangino was attempting to force her to obtain a contract to assume the maintenance responsibility of the boiler for approximately 3 years, and that Mangino was threatening to evict her because she refused to do so.

151. Plaintiff explicitly stated that the email was a formal request for assistance regarding harassment and retaliation.

152. Phraner responded that such issues were outside CDCLI's scope of responsibility and directed Plaintiff to seek legal counsel.

153. Phraner attached a move-out packet to her response.

**Statements Confirming CDCLI Policy**

154. On September 15, 2025, Phraner sent the Plaintiff an email, confirming that Mangino had: "provided [her] a 90-day Notice of Non-Renewal of Lease, which he was 'legally entitled to do'". (See Exhibit 8).

155. She also stated: "If you choose not to vacate the unit upon the lease's expiration, the landlord has indicated that he will initiate the eviction process at that point to regain possession of the property."

156. On September 16, 2025, Plaintiff requested on email that Phraner identify any law permitting continuation of a HAP contract without a written lease.

157. Phraner responded: "We would like to clarify that, per CDCLI guidelines, a new Housing Assistance Payments (HAP) contract is not required to be completed each year. The original HAP contract remains in effect for the duration of your tenancy…" (See Exhibit 9).

158. She stated on November 4: "[I]f a new yearly lease is not signed, the tenancy automatically converts to a month-to-month arrangement under standard leasing terms." See (Exhibit 10).

**Refusal to Provide the HAP Contract**

159. On November 3, 2025, Plaintiff emailed Phraner asking for a copy of the expired HAP contract.

160. On November 4, 2025, Phraner responded that the HAP contract was "between CDCLI and the landlord" and that it would "remain so". (See Exhibit 10).

161. Phraner added: "If you would like to know when your lease is up, I would encourage you to contact your landlord for that information."

**Awareness that the Laws Were Being Violated**

162. Plaintiff informed Phraner, complete with all the laws and regulations, that the tenancy was not in compliance with said laws. She explicitly stated to Phraner that her housing security was in jeopardy because of this.

**Admission of Missing Lease**

163. On November 3, 2025, Phraner replied to Plaintiff confirming that the only written lease that CDCLI had on file was from 2023. This was in violation of 24 C.F.R. § 982.158(e)(1).

**The Landlord's Choice**

164. On November 4, 2025, Phraner stated: "As for your lease, it is the responsibility of both the tenant and the landlord to ensure that a valid lease is in place each year, *if that is what the landlord chooses*. (See Exhibit 10)

165. Phraner stated: [Y]our landlord has *chosen* not to renew your lease, *which is within his rights* once your lease term has ended. If you choose not to vacate the unit and return the property to the landlord, he also has the legal right to initiate an eviction process to regain possession of the property."

166. Defendant Phraner engaged in an at least 50-page email exchange with Plaintiff, fiercely defending CDCLI's manufactured standard of operating procedures.

167. Phraner then escalated the matter to the Assistant Director, Defendant Hayes.

168. On or about November 30, 2025, Phraner sent the Plaintiff a "Notice of Overhousing", attempting to aid Defendant Mangino with a "self-help eviction", stating:

> "Based on the subsidy standards for the Housing Choice Voucher Program, your voucher size is for a 2-bedroom unit, but you are currently living in a 3-bedroom unit. This means that your family is over-housed, or lives in a home larger than is allowed. You must make arrangements to move to a 2 bedroom unit immediately. If a 2 bedroom unit is not available in your housing complex, you must submit the following certification from your landlord within 10 business days."

169. The Plaintiff responded that she was entitled to an informal hearing, pursuant to 24 CFR §982.555, before such adverse action could be taken against her. (See Exhibit 11).

170. Phraner then claimed that the notice was sent in error.

171. Phraner also enclosed a new purported amendment for 2026 in the envelope with the notice.

## IV. POLICYMAKER RATIFICATION- HAYES

172. Plaintiff hereby incorporates and realleges paragraphs 1 through 171 as if fully set forth herein.

173. On November 13, 2025, Hayes responded to the email thread for the first time, speaking only to Phraner and informing her that she would be holding a team meeting on November 17, 2025.

### Admission of Missing Lease

174. On December 3, 2025, Hayes emailed Plaintiff in a response to her request for a follow up, stating: "Per NYS HCR program rules, the public housing agency cannot require a private landlord to renew a lease." (See Exhibit 12).

175. She then confirmed that she had received Mangino's "90-day non-renewal notice".

176. Hayes goes on to state that Mangino had "chosen not to renew the lease".

### Move-Out Packet and Legal Counsel

177. Hayes then advises that Plaintiff seek counsel, begin searching for a new home and utilize the move-out packet that Phraner provided her.

178. She concludes this email with "All other concerns and issues have been addressed directly by the assigned housing specialist", referring to Phraner. "If you have any questions or need support during your move process, please feel free to contact Delores. Thank you."

**Ratification**

179. On December 4, Hayes ratifies the custom by declaring: "[I]t appears that you are on a month-to-month in this unit." (See Exhibit 13).

180. Hayes then characterizes the matter as one where Plaintiff is simply not satisfied with their responses.

**Altering the Regulation**

181. Hayes continues by attempting to alter the verbiage of 24 CFR §982.308(b)(1) by inserting the words "before the initial term of the lease" into the regulation.

**Google Research**

182. Hayes also cites 24 C.F.R. § 982.305(a)(3), in her attempt to further argue CDCLI's custom and refute the explicit verbiage of this subsection. Hayes instead argues 24 C.F.R. §982.305(c)(1), the time in which a PHA must use its best efforts to execute a HAP contract.

183. Hayes then claims that she has "reviewed the federal regulations" that Plaintiff cited and instructs Plaintiff to click on the links which she "highlighted in blue" for her to review the "full context".

184. Upon clicking the first paragraph highlighted in blue, Plaintiff found that it was a Google link, leading to the results of the search terms "HUD- prescribed tenancy addendum".

185. The second paragraph was a Google link leading to the search terms: "24 C.F.R. §982.305(a)(3)" which brings up the Cornell Law School website, with 24 C.F.R. §982.305(c)(3) highlighted.

186. Hayes then advises Plaintiff to provide Phraner with the paperwork showing the outcome of the eviction once she receives it and concludes the email with: "Thank you and have a good day."

187. Plaintiff received no further contact from Hayes.

## CAUSES OF ACTION

## COUNT I: 42 U.S.C. §1983 DEPRIVATION OF PROPERTY INTEREST IN HCV BENEFIT WITHOUT PROCEDURAL DUE PROCESS-

## DEFENDANT SEVEN TIER, LP

188. Plaintiff hereby incorporates and realleges paragraphs 1 through 187 as if fully set forth herein.

189. Plaintiff possesses a property interest in her housing voucher benefit. 42 U.S.C. §1437f and 24 C.F.R. § 982 secures her HCV benefit, by providing that both contracts required in the framework are executed coterminously.

190. The statute and regulation also provide that a lease must contain a renewal clause, be written and for a term not less than one year.

191. This is not an abstract need, desire or unilateral expectation. It is a government created entitlement, which cannot be deprived without due process.

192. The LA cannot lawfully terminate a voucher, which is the functional result of the absence of a valid lease, without providing the formal hearing required by federal regulations.

193. Thus, CDCLI employees may not lawfully obtain the practical effect of termination of the Plaintiff's benefit, by applying the month to month custom in place of the hearing, to get the same end result of no lease.

194. Due process forbids the government from accomplishing indirectly, through administrative circumvention, what it could not do directly without constitutionally adequate procedure. *Goldberg v. Kelly*, 397 U.S. 254 (1970). *Mathews v. Eldridge*, 424 U.S. 319 (1976).

195. Defendant Seven Tier utilized CDCLI's "month-to-month" custom to effectuate the functional equivalent of terminating Plaintiff's HCV benefits.

196. The first written lease between Seven Tier and the Plaintiff expired on or about November 30, 2018.

197. Seven Tier did not offer a lease renewal for December 2018 to on or about March 2019, 2020, 2021 and 2022.

198. During this time Seven Tier did not certify that it had executed a written lease, with a TA included or its exact regulatory verbiage.

199. Seven Tier did not certify on a renewed HAP contract, that it was in compliance with the HQS.

200. It did not enter a renewed HAP contract, coterminous with a new written lease, for not less than one year.

201. Instead, after Barry recertified Plaintiff's eligibility for the benefit, Seven Tier accepted from Barry, so-called Housing Choice Voucher Program Contract and Tenancy Addendum Amendment letters, for December 2018 to on or about March 2019, 2020, 2021 and 2022.

202. After receiving these purported amendments, Seven Tier accepted payments consistently, for on or about 4 years.

203. Barry stepped into Plaintiff's shoes, renegotiated the terms of the first written lease and agreed to rent increases with Seven Tier for on or about March 1, 2021 and December 1, 2022.

204. Barry then dictated the new terms to Plaintiff by sending her purported amendments.

205. Such forced Plaintiff to pay more rent that she had not agreed to and had every right to reject.

206. Barry then processed these increased payments to Seven Tier, for the years 2021 and 2022.

207. Seven Tier collected said increased payments.

208. The constitutional protection is not defeated simply because payments continued to flow. Where Seven Tier and Barry acted jointly to maintain the appearance of continued assistance, while stripping away the statutory and regulatory architecture that confers the benefit's protections for the Plaintiff, Defendants deprived the Plaintiff of the legally protected benefit in substance.

209. Seven Tier, acting knowingly and willingly with Barry, therefore violated Plaintiff's Fourteenth Amendment right to procedural due process, by accomplishing the same result indirectly through the month-to-month custom and the purported amendments, while preserving the voucher nominally to continue receiving payments from the government.

**DEFENDANT BARRY**

210. Plaintiff hereby incorporates and realleges paragraphs 1through 209 as if fully set forth herein.

211. Defendant Barry's conduct constituted an unlawful "end-run" around the Housing Choice Voucher (HCV) protections and thereby deprived Plaintiff of her protected property interest in her HCV benefit, without constitutionally required process.

212. Barry admitted that she was applying CDCLI's custom, instead of the required structure, stating: "As you recertify with our program, we continue to renew our cont[r]act (the HAP contract) with the landlord."

213. During annual recertifications Barry, acting under color of law and in her official capacity for CDCLI, routinely applied and enforced the month-to-month custom in place of the required lease-renewal and tenancy-addendum structure.

214. Barry implemented the custom by issuing so-called Housing Choice Voucher Program and Tenancy Addendum Amendments, after each recertification for the period of:

- December 1, 2018, to December 2019
- December 1, 2019-2020
- December 1, 2020- 2021
- On or about March 1, 2021-December 1, 2022, and such was signed by Marianne Scopo, the Assistant Director, Rental Assistance at the time.
- December 1, 2022, through December 1, 2023, and such was signed by Mildred Rivera, Vice President, Rental Assistance.

215. Without Plaintiff's mutual assent or any executed renewal leases, Barry agreed to Seven Tier's unilateral rent increases on December 1, 2021 (from $2,082 to $2,368) and December 1, 2022 (from $2,368 to $2,485).

216. Barry processed HAP payments to Seven Tier when it had not offered, entered into or executed renewal leases with Plaintiff for 2018, 2020, 2021 and 2022.

217. Barry processed said payments for approximately forty-eight months, to include the aforesaid rent increases.

218. Barry allowed Seven Tier to offload his HQS responsibility onto Plaintiff for said years.

219. Barry defended Seven Tier regarding its abandonment of its HQS responsibilities stating: "You do…have a point of contact…the point of contact works with the landlord directly."

220. Barry basically told Plaintiff that if she did not like how CDCLI operated, she could always surrender her voucher, by stating: "You may withdraw from this program".

221. Barry minimized the magnitude of depriving Plaintiff of her property interests with an apology to Plaintiff that things simply "[had] changed in the last two years".

222. Barry's acts and admissions obtained the functional equivalent of a termination of the Plaintiff's benefit for her 448 home, without the notice and the hearing required by due process.

223. Barry acting jointly with Seven Tier, violated Plaintiff's Fourteenth Amendment right to procedural due process. Said Defendants achieved the functional termination of her benefits through a month-to-month custom and unauthorized amendments, preserving the voucher only in name, to ensure the continued flow of government funds.

**DEFENDANT MANGINO**

224. Plaintiff hereby incorporates and realleges paragraphs 1 through 223 as if fully set forth herein.

225. Mangino utilized CDCLI's month to month custom, which effectuated the functional equivalent of the termination of the Plaintiff's HCV voucher, while leaving the voucher nominally intact, so he could continue to receive payments.

226. Mangino, acting jointly with Phraner, did not offer Plaintiff written lease renewals, including the TA for 2024, 2025 or 2026,

227. Mangino did not certify on a renewed HAP contract, coterminous with a renewed lease, that he had complied with all the statutory and regulatory requirements, which would afford him the right to receive rent payments from CDCLI.

228. Mangino acting jointly with Phraner, engaged in a unilateral bargaining process to raise Plaintiff's rent on or about October 28, 2025, from $3000 to $3250- even after Mangino had already served the Plaintiff with its purported termination notice.

229. Mangino then accepted HAP payments processed by Phraner, without Plaintiff's mutual assent or executing written lease renewals with Plaintiff or certifying that he had done so.

230. Mangino, accepted so-called Housing Choice Voucher Program Contract and Tenancy Addendum Amendments under the month to month custom, instead of the statutory and regulatory requirements, which protected Plaintiff's property interest in her benefit.

231. Mangino, relentlessly, harassed Plaintiff and attempted to physically intimidate her into accepting his HQS responsibility for his boiler by obtaining a service contract in her name.

232. Where Mangino and Phraner acted jointly to maintain the appearance of continued assistance, while stripping away the statutory and regulatory architecture that confers the voucher's protections for the Plaintiff, Defendants deprived the Plaintiff of the voucher's legally protected benefit in substance.

233. Mangino, acting jointly with Phraner, therefore violated Plaintiff's Fourteenth Amendment right to procedural due process, by accomplishing the same result indirectly through the month-to-month custom, while preserving the voucher nominally to continue payments.

## DEFENDANT PHRANER

234. Plaintiff hereby incorporates and realleges paragraphs 1through 233 as if fully set forth herein.

235. Defendant Phraner's conduct constituted an unlawful "end-run" around the Housing Choice Voucher (HCV) protections and thereby deprived Plaintiff of her protected property interest in her voucher, without constitutionally required process.

236. On November 4, 2025, Phraner admitted the existence and her implementation of CDCLI's custom, stating: "[I]f a new yearly lease is not signed, the tenancy automatically converts to a month-to-month arrangement under standard leasing terms."

237. On September 15, 2025, she also stated, "We would like to clarify that, per CDCLI guidelines, a new Housing Assistance Payments (HAP) contract is not required to be completed each year. The original HAP contract remains in effect for the duration of your tenancy…"

238. Phraner, issued so-called Housing Choice Voucher Program and Tenancy Addendum Amendments, after each recertification for the periods of:

- February 1, 2024, through February 1, 2025
- February 1, 2025, through February 1, 2026, and
- February 1, 2026.

239. Phraner, stepped into Plaintiff's shoes and bargained with Mangino, to agree to an increase in rent on or about October 28, 2025, from $3,000 to $3,250.

240. Yet on November 3, 2025, when Plaintiff asked to see a copy of the purported current HAP contract, she remarked that it was: "between CDCLI and the landlord" and it would "remain so".

241. On November 3, 2025, she admitted that the only lease she had on file was the very first one from 2023.

242. She further admitted the same, advising Plaintiff: "If you would like to know when your lease is up, I would encourage you to contact your landlord for that information."

243. Phraner's acts and admissions obtained the functional equivalent of terminating Plaintiff's benefit for her 374 home, without the notice and the hearing required by due process.

244. Phraner, acting jointly with Mangino, violated Plaintiff's Fourteenth Amendment right to procedural due process. Defendants achieved the functional termination of her benefits through a month-to-month custom and unauthorized amendments, preserving the voucher only in name, to ensure the continued flow of government funds.

**COUNT II: 42 U.S.C. §1983 DEPRIVATION OF PROPERTY INTEREST IN LEASEHOLD WITHOUT PROCEDURAL DUE PROCESS- SEVEN TIER, LP**

245. Plaintiff hereby incorporates and realleges paragraphs 1 through 244 as if fully set forth herein.

246. As an HCV recipient, Ms. Trotter has a property interest in continuing her tenancy in her home. *Sinisgallo v. Town of Islip Hous. Auth.*, 865 F. Supp. 2d 307 (E.D.N.Y. 2012).

*Walls v. Giuliani*, 916 F. Supp. 214 (E.D.N.Y. 1996). *Augusta v. Cmty. Dev. Corp. of Long Island, Inc.*, No. 07-CV-0361, 2008 WL 5378386 (E.D.N.Y. Dec. 23, 2008).

247. A property interest exists where rules or understandings from an independent source (statute, regulation, contract) create a legitimate entitlement, not a unilateral expectation.

248. A required renewal clause creates a regulatory entitlement, not a private expectation.

249. HUD rules require a renewal term in the lease.

250. The PHA approves the lease because it contains that renewal term and the HAP contract incorporates and depends on that renewal structure.

251. Thus, the Plaintiff's right to a renewal of her lease is a government-created entitlement. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Perry v. Sindermann,* 408 U.S. 593 (1972).

252. In addition, a leasehold interest, including a contractual right to renewal, constitutes a protected property interest.

253. CDCLI's month to month custom, instead of administering the HCV program in compliance with 42 U.S.C. §1437f and 24 CFR §982, deprived the Plaintiff of her legitimate entitlement to her lease renewals, which in turn deprived her leasehold, which deprived her of continued tenancy.

254. Seven Tier, acting jointly with Barry and CDCLI, deprived Plaintiff of procedural due process, by relying on the absence of the written lease and formal structure of the tenancy, to characterize Plaintiff's noncompliant tenancy, as month to month.

255. Instead of including the regulatory requirement of a lease renewal in the lease of 2017, Seven Tier included a clause that the Plaintiff would "peacefully surrender" the premises to it at the end of the first term.

256. Seven Tier then, acting jointly with Barry and CDCLI, invoked the manufactured month to month status and then used it as a basis to deprive the Plaintiff of a proper termination notice.

257. On or about August 19, 2022, Seven Tier served Plaintiff a 90- Day notice "electing" to purportedly terminate and not renew her lease, when in fact it had deprived her of her leasehold for on or about 4 years.

258. Because this month-to-month custom left Plaintiff without a written lease for 2022, such enabled Seven Tier to avoid asserting any grounds for good cause, in violation of 42 U.S.C.A. §§ 1437f.(d)(1)(B)(iv) and (o)(7)(C); 24 C.F.R. § 982.310(e)(2)(i).

259. Barry accepted Seven Tier's notice as adequate.

260. Because Barry and CDCLI accepted this purported notice, Seven Tier was able to move forward and file a summary eviction proceeding, pleading only that Plaintiff was a month to month "holdover", evading a showing of good cause and disclosure of the material fact of Plaintiff's HCV status, as required under RPAPL §741.

261. As a result, on or about January 29, 2023, Plaintiff had to flee from her 448 Home.

262. As such, Seven Tier, acting jointly with Barry and CDCLI, deprived Plaintiff of her leasehold, lease renewal and continued tenancy property interests, without notice, good cause and a meaningful opportunity to be heard in a summary eviction proceeding.

263. Thus, Seven Tier deprived the Plaintiff of procedural due process protected by the 14th Amendment to the United States Constitution.

**DEFENDANT BARRY**

264. Plaintiff hereby incorporates and realleges paragraphs 1 through 263 as if fully set forth herein.

265. Barry deprived Plaintiff of her property interest in her lease renewal, leasehold and continued tenancy, by accepting the purported notice of termination of the Plaintiff's tenancy from Seven Tier, when she knew full well that she had not ensured that such had been formed for the aforesaid years,

266. She also did the same, when she paved the way for Seven Tier to file a holdover eviction against Plaintiff, merely stating that she was a month to month tenant, instead of pleading good cause under 42 U.S.C.A. §§ 1437f.(d)(1)(B)(iv) and (o)(7)(C); 24 C.F.R. § 982.310(e)(2)(i) and the TA.

267. Barry, acting jointly with Seven Tier, deprived Plaintiff of her lease renewals, leasehold and continued tenancy property interests, without notice and a meaningful opportunity to be heard, before she could be removed from her home.

268. Thus, Barry deprived the Plaintiff of her constitutional right to procedural due process, under the 14th Amendment to the United States Constitution.

**DEFENDANT MANGINO**

269. Plaintiff hereby incorporates and realleges paragraphs 1 through 268 as if fully set forth herein.

270. Mangino, acting jointly with Phraner and CDCLI, deprived Plaintiff of procedural due process, by relying on the absence of the written lease and formal structure of the tenancy, to characterize Plaintiff's noncompliant tenancy, as month to month.

271. Mangino served the Plaintiff with a purported termination notice which asserted no grounds for good cause.

272. Mangino served the same upon CDCLI.

273. Phraner accepted the notice as adequate.

274. Mangino then cloaked a retaliatory eviction in the garb of a "holdover" summary proceeding.

275. Mangino pleaded no grounds for good cause in his petition, under federal law and in compliance with RPAPL §741.

276. Because Phraner and CDCLI accepted his purported notice, Mangino was able to move forward and file a summary eviction proceeding, pleading only that Plaintiff was a month to month "holdover", evading a showing of good cause and disclosure of the material fact of Plaintiff's HCV status, as required under RPAPL §741.

277. As a result, Plaintiff has been subjected to a summary eviction proceeding since on or February 5, 2026, that she never should have been subjected to without adequate notice and a meaningful opportunity to be heard.

278. Mangino, acting jointly with Defendant Phraner, and CDCLI, deprived Plaintiff of her HCV leasehold, lease renewal and continued tenancy property interests, without procedural due process, in violation of the 14th Amendment to the Constitution of the United States.

**DEFENDANT PHRANER**

279. Plaintiff hereby incorporates and realleges paragraphs 1 through 278 as if fully set forth herein.

280. Phraner deprived Plaintiff of her property interest in her right to lease renewals, leasehold and continued tenancy, by accepting a purported notice of termination of a tenancy from Mangino, knowing that she had not ensured that such had been formed for the aforesaid years.

281. On September 15, 2025, Phraner admitted that Mangino had "provided [her] a 90-day Notice of Non-Renewal of Lease" and claimed that he was "legally entitled" to terminate Plaintiff's tenancy.

282. The notice contained no grounds for good cause.

283. Because Phraner accepted this notice, Mangino was able to proceed and file a petition to evict Plaintiff and merely plead that she was a holdover.

284. On November 4, 2025, she stated that the leases only have to be renewed if the landlord "chooses" to renew it and, "[Y]our landlord has chosen not to renew your lease, which is within his rights once your lease term has ended. If you choose not to vacate the unit and return the property to the landlord, he also has the legal right to initiate an eviction process to regain possession of the property."

285. Phraner did not just implement the custom, she fiercely fought for it on a back and forth email of no less than 50 pages over approximately 6 days.

286. Phraner, acting jointly with Mangino, deprived Plaintiff of her lease renewals, leasehold and continued tenancy property interests, without notice and a meaningful opportunity to heard, before she could be removed, or subjected to removal from her home.

287. Thus, Phraner deprived the Plaintiff of her constitutional right to procedural due process, under the 14th Amendment to the United States Constitution.

## PERSISTENT AND WIDESPREAD CUSTOM

288. Plaintiff hereby incorporates and realleges paragraphs 1 through 287 as if fully set forth herein.

289. The repeated application of this policy across multiple tenancies and over a span of seven years for the Plaintiff, demonstrates that it was persistent and widespread such that it had

the force of law. *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015).

290. In addition, in that CDCLI also explicitly stated in its Housing Choice Voucher Program Guidebook for Participants, from on or about December 1, 2008, that tenancies automatically transform to a month to month status, it has implemented this custom, practice, or usage for at least 17 years.

**CONSTRUCTIVE KNOWLEDGE**

291. Plaintiff hereby incorporates and realleges paragraphs 1 through 290 as if fully set forth herein.

292. In that Plaintiff was indeed subjected to this very custom in two different homes, with two different landlords, and two different workers, over a span of approximately seven years, CDCLI's policymakers had constructive knowledge of this unconstitutional custom.

**ACTUAL KNOWLEDGE**

293. Plaintiff hereby incorporates and realleges paragraphs 1 through 292 as if fully set forth herein.

294. In that Barry on May 4, 2022, stated that she was copying Plaintiff's complaints to her supervisor and Phraner, forwarded the not less than 50 page email to the Assistant Director herself, Hayes, CDCLI had actual knowledge of the custom.

295. In that Phraner and Hayes engaged in an email battle with the Plaintiff, fiercely insisting that the regulations supported CDCLI's month to month custom, CDCLI policymakers had actual knowledge of the custom.

296. In that Hayes on December 4, 2025, even attempted to rewrite 24 CFR §982.308(b)(1) by inserting the words "before the initial term of the lease" into the regulation, CDCLI's policymakers not only had actual knowledge of the custom, it fought to maintain it.

297. In that the Director herself, Lori Corrar, was copied on this lengthy email, CDCLI's policymaker had actual knowledge of the unconstitutional, month to month practice.

298. In that the Director, a Vice President of Rental Assistance, and two different Assistant Directors signed the so-called yearly amendments, CDCLI had actually knowledge of the custom which caused due process deprivations.

299. CDCLI's Assistant Director, Defendant Hayes, ratified the custom by explicitly stating to Plaintiff on email: "[I]t appears that you are on a month-to-month in this unit."

## CONSTRUCTIVE ACQUIESENCE

300. Plaintiff hereby incorporates and realleges paragraphs 1 through 299 as if fully set forth herein.

301. CDCLI's policymakers, on constructive and actual notice, constructively acquiesced to the custom.

302. Hayes did not try to rectify the deprivation, but merely instructed Plaintiff to utilize the move-out packet that Phraner had sent her.

303. Barry also sent a move-out packet.

304. Phraner sent a move-out packet.

305. Although the Director Lori Corrar was added to the lengthy email, she took no steps to abolish the custom and restore the legal, protective procedures of the program.

306. Mildred Rivera, a Vice President of Rental Assistance, on October 21, 2022, signed a purported amendment, thus she had actual knowledge of the custom, but constructively acquiesced to it.

307. Marianne Scopo, an Assistant Director of Rental Assistance, on February 26, 2021 signed a purported amendment, thus she had actual knowledge of the custom, but constructively acquiesced to it.

308. CDCLI issued its new tenants handbooks which explicitly stated that a tenant automatically converts to month to month, as far back as at least 2008, thus CDCLI had actual knowledge of the custom, but constructively acquiesced it.

**DELIBERATE INDIFFERENCE**

309. Plaintiff hereby incorporates and realleges paragraphs 1 through 308 as if fully set forth herein.

310. CDCLI showed deliberate indifference when its employees made the following apathetic statements:

311. On May 4, 2022, Barry stated: "You may withdraw from this program".

312. She also stated: "You do…have a point of contact…the point of contact works with the landlord directly."

313. She then apologized that "things [had] changed in the last two years".

314. On November 9, 2022, Barry stated "…you may choose to pay your portion, you may vacate, you may stay and he will choose to go through the eviction process…this is all up to you as you are the head of the household."

315. On August 27, 2025 Phraner responded that Mangino harassing the Plaintiff and trying to force her enter into a contract to assume his HQS responsibilities were matters "outside CDCLI's scope" of duties and directed Plaintiff to seek legal counsel.

316. On September 15, 2025 Phraner stated: "If you choose not to vacate the unit upon the lease's expiration, the landlord has indicated that he will initiate the eviction process at that point to regain possession of the property."

317. On November 4, 2025, she stated: "As for your lease, it is the responsibility of both the tenant and the landlord to ensure that a valid lease is in place each year, *if that is what the landlord chooses*. [Y]our landlord has *chosen* not to renew your lease, which is within his rights once your lease term has ended. If you choose not to vacate the unit and return the property to the landlord, he also has the legal right to initiate an eviction process to regain possession of the property."

318. On November 3, 2025 Phraner stated: "If you would like to know when your lease is up, I would encourage you to contact your landlord for that information."

319. On December 3, 2025, Hayes states that Mangino had "*chosen* not to renew the lease".

320. She also states: "Per NYS HCR program rules, the public housing agency cannot require a private landlord to renew a lease."

321. Hayes advises that Plaintiff seek counsel, begin searching for a new home and utilize the move-out packet that Phraner provided her with.

322. She further states: "All other concerns and issues have been addressed directly by the assigned housing specialist", referring to Phraner. "If you have any questions or need support during your move process, please feel free to contact Delores. Thank you."

323. Hayes ends the email thread with: "Thank you and have a good day."

## MOVING FORCE

324. Plaintiff hereby incorporates and realleges paragraphs 1 through 323 as if fully set forth herein.

325. As without the policy, custom, practice or usage of the "Automatic Month to Month" tenancy, Plaintiff's constitutional rights would not have been violated.

326. If CDCLI had not implemented its unofficial custom, Plaintiff would have had written lease renewals for not less than one year, after every recertification, which would have secured her due process protections, when facing an unlawful eviction.

327. Such would have also prevented her from suffering the functional equivalent of a termination of her benefit, without the due process requirement of an administrative hearing.

328. On actual and constructive notice and upon a failure to train, CDCLI's employees and final policymakers were deliberately indifferent to the custom.

329. Thus, this policy, practice or custom and such deliberate indifference was the moving force behind the deprivations.

## FAILURE TO TRAIN-

## DEFENDANT HAYES

330. Plaintiff hereby incorporates and realleges paragraphs 1 through 329 as if fully set forth herein.

331. CDCLI had a duty to train its employees on the requirements of federal housing law, including renewal lease execution, HAP contract limitations, and termination procedures.

332. CDCLI made a decision not to train its employees on the correct procedure for lease renewals, pursuant to 42 U.S.C. §1437f and 24 CFR §982.

333. CDCLI was deliberately indifferent, in that it had a pattern of recertifications without lease and HAP renewals, extending across two tenancies, two landlords, two housing specialists, 2 Assistant Directors and multiple employees signing off on the purported amendments as aforedescribed, over a span of seven years.

334. For each of the seven years, CDCLI's employees issued the "Contract and Tenancy Addendum Amendments" letters, to Plaintiff, instead of ensuring that the landlords had actually executed lease renewals with the Plaintiff.

335. The training program was inadequate in that there was not one at all.

336. This is evident as Assistant Director, Defendant Hayes, had to conduct Google searches, to find the regulations of 24 CFR §982. Such shows that CDCLI does not even know where to find the regulations, let alone train its employees to adhere to them.

337. It is also evident in that its employees fervently fought the Plaintiff on the not less than 50 page email, insisting that the Month to Month custom was correct.

338. The deficiency in training, or lack of a training program at all, in the correct way to renew a tenancy under the HCV program, caused Plaintiff to be subjected to a deprivation of her right to due process before she could be stripped of her HCV benefit and leasehold property interests.

339. Even without a pattern- which there was one- the need for specific training in tenancy renewals was obvious.

340. Hayes supervises the employees of CDCLI.

341. CDCLI manages rental assistance for approximately 8, 925 tenants.

342. With such a significant number of tenants it is statistically inevitable that its employees are tasked with renewing the lease and HAP structure, which ordinarily results in the attachment of the statutory and regulatory protections.

343. The lease is the written instrument which secures the interest in the property.

344. It is obvious that leaving the tenant without its written legal instrument makes the tenant being evicted without due process highly predictable.

345. It is also highly predictable that the employees' failure to ensure that the statutory and regulatory framework is in place annually, will subject the tenant to the functional equivalent of a termination of the benefit, without the due process of an administrative hearing.

346. In light of this obviousness, Hayes', failure to ensure that CDCLI's employees received adequate training on how 42 USC §1437f and 24 CFR §982 work together to protect the constitutional rights of tenants, constitutes deliberate indifference to the obvious need for the training.

347. Had CDCLI trained its employees, or established an adequate training program, Plaintiff would not have been subjected to evictions with inadequate notice, brought upon petitions that evaded the requirement of a showing of good cause.

348. Plaintiff also would not have suffered the functional equivalent of the termination of her benefit, without an administrative hearing.

349. Thus, Hayes' and CDCLI's failure to train was the moving force behind the deprivations of Plaintiff constitutional rights.

**INJURY**

350. Plaintiff hereby incorporates and realleges paragraphs 1through 349 as if fully set forth herein.

**WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:**

a. An order staying, enjoining, and restraining Defendants (and any sheriff, marshal, or other state or local official) from proceeding with, executing, enforcing, or otherwise giving effect to any eviction, writ of possession, warrant of eviction, execution, or similar removal or enforcement action against Plaintiff or Plaintiff's dwelling pending final disposition of this action;

b. Compensatory and punitive damages against the individual Defendants in their individual capacities in an amount to be proven at trial;

c. Compensatory Damages for the severe emotional distress, mental anguish, and loss of security caused by the Defendants' intentional circumvention of procedural due process;

d. Compensatory Damages for the economic loss of unauthorized rent increases totaling $13,702 against Defendant Seven Tier;

e. Compensatory Damages for the economic loss of unauthorized rent increases totaling $13,702 against Defendant Barry;

f. A temporary restraining order and/or preliminary injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons acting in concert with them from implementing, enforcing, applying, or continuing the unlawful practices described herein, including but not limited to the challenged policy, custom, or practice that results in the wrongful denial of the Plaintiff's lease renewals, functional equivalent of termination of her housing benefit, or summary eviction procedures against the Plaintiff;

Community Development Corporation Of Long Island
2100 Middle Country Road, Suite 300, Centereach, NY 11720
631.471.1215 • www.cdcli.org

# HOUSING CHOICE VOUCHER PROGRAM
# CONTRACT AND TENANCY ADDENDUM AMENDMENT

Log Number: 14428 County # 52 Dated: December 01, 2018

Owner: Seven Tier LP

Tenant: Kyung L. Trotter

Address: 448 Donald Blvd.
(Left Side)
Holbrook, NY 11741

The Housing Assitance Payments Contract specified above is hereby amended as follows:

**REASON FOR AMENDMENT**

__X__ **Interim Recertification**

**ADJUSTMENTS IN PAYMENTS**

| | |
|---|---|
| Tenant Rent | **$938.00** |
| HAP Payment | **$1,430.00** |
| Total Contract Rent | **$2,368.00** |

**EFFECTIVE DATE**

The amendment to the Housing Assistance Payment Contract and Tenancy Addendum will be effective **March 01, 2021** The next tenant annual recertification is due on. **December 01, 2021**

The adjustments outlined above have been made in accordance with Housing Assitance Payment Contract B, 7(C)(2) and Part C, 5(b) and in accordance with the Tenancy Addendum, 15(c) and (d), and do not require the signatures of the Owner or Family.

This notice is presentd to you in accordance with th terms and conditions of the Housing Assistance Payments Contract and the Tenancy Addendum. All other covenants, terms and conditions of the original Housing Assitance Payments Contract and Tenancy Addendum remain the same.

HOUSING TRUST FUND CORP. (PHA)
Community Development Corporation of Long Island

BY: Marianne Scopo

Marianne Scopo, Assistant Director, Rental Assistance

DATE February 26, 2021

Exhibit 1

Community Development Corporation Of Long Island
2100 Middle Country Road, Suite 300, Centereach, NY 11720
631.471.1215 • www.cddli.org

# HOUSING CHOICE VOUCHER PROGRAM
# CONTRACT AND TENANCY ADDENDUM AMENDMENT

Log Number: 14428 County # 52 Dated: December 01, 2018

Owner: Seven Tier LP

Tenant: Kyung L Trotter

Address: 448 Donald Blvd
(Left Side)
Holbrook, NY 11741

The Housing Assitance Payments Contract specified above is hereby amended as follows:

**REASON FOR AMENDMENT**

X **Annual Recertification**

**ADJUSTMENTS IN PAYMENTS**

| | |
|---|---|
| Tenant Rent | **$813.00** |
| HAP Payment | **$1,672.00** |
| Total Contract Rent | **$2,485.00** |

**EFFECTIVE DATE**

The amendment to the Housing Assistance Payment Contract and Tenancy Addendum will be effective **December 01 , 2022** The next tenant annual recertification is due on. **December 01 , 2023**

The adjustments outlined above have been made in accordance with Housing Assitance Payment Contract B, 7(C)(2) and Part C, 5(b) and in accordance with the Tenancy Addendum, 15(c) and (d), and do not require the signatures of the Owner or Family.

This notice is presentd to you in accordance with th terms and conditions of the Housing Assistance Payments Contract and the Tenancy Addendum. All other covenants, terms and conditions of the original Housing Assitance Payments Contract and Tenancy Addendum remain the same.

HOUSING TRUST FUND CORP. (PHA)
Community Development Corporation of Long Island

BY: Mildred Rivera

Mildred Rivera, Vice President, Rental Assistance

DATE October 31, 2022

# HOUSING CHOICE VOUCHER PROGRAM

Administered By:
Community Development Corporation of L.I.
2100 Middle Country Road, Suite 300
Centereach, NY 11720-3576

For more information,
Visit our website

www.cdcli.org

Phone: (631) 471-1215
Fax: (631) 471-2167

# Guidebook for Participants

Exhibit 2

## Commonly Asked Questions

*Why does my Housing Specialist change each year?*

Our team is based on a system of checks and balances. Changing housing specialists annually assists us in providing quality services to all program participants while ensuring regulatory compliance

*How long do I have to wait to move?*

The HAP term is for 1 full year and automatically renews on a month to month basis after the first year until either party gives a full 30 day written notice.

*What do I have to do to move?*

You must be in compliance with all program regulations and have met all move out procedures.

*How do I schedule an inspection when I move?*

Once you have submitted your completed Request for Tenancy package your housing specialist will submit the request for our inspection team. The inspector will contact the new landlord directly to schedule an appointment. Your housing specialist does not schedule appointments.

*Will CDC pay my security deposit?*

NO. The Housing Choice Voucher Program subsidizes rent only. If you need assistance with a security deposit, you can contact the Department of Social Services. You must provide your housing specialist with proof that the security has been paid or a guarantee letter from DSS before you move into the unit.

*Can I move if I owe my landlord, CDC, or utilities?*

All repayments and rent must be paid in full. You must be current with your utilities and/or payment agreement in order to move because you will have to be able to get services at your new unit. If you are moving out of Suffolk County all utilities must be paid in full.

*My landlord will not make a repair, what should I do?*

If you have contacted your landlord and informed them that something is in need of repair and get no response, you must put it in writing to your housing specialist so a special inspection request can be made. **Do not stop paying rent.**

*Can I move people in with me?*

No, not without written approval from both the landlord and CDC. Restrictions do apply and a request to add a family member is not guaranteed approval. If you give birth, you must provide a copy of the child's birth certificate and social security card. In the case of a minor, custody must be awarded.

## Scheduling Inspections

CDC will schedule initial inspections in accordance with program requirements. Annual inspections, quality control inspections, and all resulting re-inspections will be scheduled by CDC's inspectors with the tenant and/or owner. Annual inspections must be scheduled so that all units are inspected every 12 months. It is the obligation of the family to allow CDC to inspect the unit at reasonable times and after reasonable notice in order to continue participating in the housing choice voucher program.

## Reasonable Rent

CDC must ensure that rents charged by owners to housing choice voucher program participants are reasonable. This determination involves two comparisons. First, CDC must compare the rent for the voucher units to rents for similar unassisted units in the marketplace. Second, CDC must compare the rent to rents for similar units on the premises.

## Comparability

In conducting rent reasonableness, CDC must determine whether the rent to the owner is a reasonable rent in comparison to rent for other comparable unassisted units. In determining comparability, CDC must consider:

- Location, quality, size, unit type, and age of the contract unit, and
- Amenities, housing services, maintenance, and utilities the owner must provide under the lease

## Payment Standards

A payment standard is used to calculate the monthly housing assistance payment for a family. The payment standard is a maximum set by New York State Division of Housing and Community Renewal (DHCR). It is determined from cost data for the Nassau/Suffolk region for modest, safe housing of a particular structure. Currently the payment standards are as follows:

| Bedroom Size | Payment Standards Effective 12/1/08 |
|---|---|
| 0 | $1,050 |
| 1 | $1,339 |
| 2 | $1,600 |
| 3 | $2,100 |
| 4 | $2,200 |
| 5 | $2,530 |

On Wednesday, May 4, 2022, 01:02:06 PM EDT, Leslie B <leslieb@cdcli.org> wrote:

Hi Ms. Trotter,

I am including my supervisor on this thread.

As stated previously, The HAP is between CDCLI and the landlord and the lease is between you and your landlord. As you recertify with our program, we continue to renew our contact (The HAP) with the landlord. The reason for two separate contracts is because he receiving two portions of rent: yours and what is issued through CDCLI.

And as for our understanding, your landlord does comply with HQS and makes all repairs that are needed in a timely matter and has passed annual inspections, or makes the corrections that are deemed necessary if an inspection fails. You do also have a point of contact to communicate any and all issues that occur, as you, your landlord, and CDCLI's inspector has explained to me that the point of contact works with the landlord directly. I apologize that things have changed in the last two years, however because this is deemed a tenant/landlord issue, we do not get involved. Especially when he is in compliance with our program and adheres to the rules and regulations.

Additionally, we have also been made aware that your landlord has tried to work with you to make repairs as necessary but there have been issues with allowing contractors to come into the home. And if repairs are not being made due to refusal of allowing contractors into the property or no one being home, then that responsibility is removed from the landlord.

I will also remind you that this is a voluntary program and you may choose to withdraw from this program if you do not wish to comply with rules and regulations. Should you want such a document in writing that states you only want communication with your landlord directly, you may seek legal advice on how to do so. But, as I have stated, your landlord is in compliance and makes repairs as deemed necessary and you do have a point of contact.

CDCLI50

**Leslie B.**

Housing Specialist |Rental Assistance

**Community Development Corporation of Long Island**

Phone: 631-471-1215 X 114 |Fax: 631-619-1829 | LeslieB@cdcli.org

2100 Middle Country Road

Centereach, NY 11720

Exhibit 3

# RE: Homeownership Assistance

From: kyung trotter (trotter.kyung@yahoo.com)

To: leslieb@cdcli.org

Date: Tuesday, November 29, 2022 at 02:41 PM EST

Hi Leslie,

Let him go.

Kyung

Sent from Yahoo Mail on Android

On Tue, Nov 29, 2022 at 14:40, Leslie B <Leslieb@cdcli.org> wrote:

As stated previously, you may choose to pay your portion, you may vacate, you may stay and he will choose to go through the eviction process....this is all up to you as you are the head of household.

**Leslie B.**
Senior Housing Specialist | Rental Assistance
**Community Development Corporation of Long Island**
(631)-471-1215 X 114 | Fax: 631-648-5003 | LeslieB@cdcli.org |
www.cdcli.org
2100 Middle Country Road
Centereach, NY 11720

**PLEASE TAKE NOTICE:** The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you receive this transmission in error, please contact the sender immediately and delete the material from any computer where it may reside.

**From:** kyung trotter <trotter.kyung@yahoo.com>
**Sent:** Tuesday, November 29, 2022 2:37 PM
**To:** Leslie B <Leslieb@cdcli.org>
**Subject:** RE: Homeownership Assistance

Exhibit 4

# NINETY DAYS NOTICE TO TERMINATE TENANCY

TO: Kyung L. Trotter
448 Donald Boulevard (left side)
Holbrook, NY 11741

**PLEASE TAKE NOTICE,** that the undersigned, the landlord of premises known as and by 448 Donald Boulevard (left side), Holbrook, NY 11741, hereby elects not to renew your tenancy and further elects to terminate your tenancy as of November 30, 2022 at said premises. Please be further advised that you may not use your security deposit as your last months rent and that if you do not vacate by November 30, 2022, you will be considered a hold-over tenant(s). Unless you remove yourselves from said premises on or before November 30, 2022, summary proceedings under Article 7 of the Real Property Actions and Proceedings Law of the State of New York to remove you therefrom will be commenced by the undersigned.

DATED: August 3, 2022

CRAIG RUBENSTEIN, President of
SEVEN TIER REALTY INC., General Partner
of SEVEN TIER, L.P., Landlord

Exhibit 5

Blumbergs Law Products ®

T 309—Omnibus Notice of Termination of Tenancy of Non-Regulated Residences, 7-19
(In N.Y.C. serve in same manner as a Notice of Petition)

©2019 by BlumbergExcelsior, Inc., Publisher, NYC 1 1241
www.blumberg.com

Tuesday, August 19th, 2025

Re: Premises:
Five- rooms side ~~Apt. No~~ of house
at 374 Donald Avenue, Holbrook, New York 11741;
used for x☒ Dwelling ☐ Business purposes.

COPY

TO:

Tenant and, Undertenant*

KYUNG L. TROTTER,
374 Donald Avenue,
HOLBROOK, NEW YORK 11741;

First name of Tenant and/or Undertenant being fictitious and unknown to petitioner, person intended being in possession of the premises herein described

or assigns, and every person in possession of the premises.

You are hereby notified that the Landlord elects to terminate your tenancy of the above described premises now held by you under monthly hiring. Unless you remove from the said premises on Sun Nov 30, 2025 the day on which your term expires, the Landlord will commence summary proceedings under the Statute to remove you from said premises for the holding over after the expiration of your term within the time frame and for the reasons checked below and will demand the value of your use and occupancy of the premises during such holding over.

Pursuant to the Housing Stability and Tenant Protection Act of 2019,

~~☐ 30 Day Notice~~ — required if a tenant has a lease of less than one (1) year

~~☐ 60 Day Notice~~ — required if a tenant has a lease of at least one (1) year but less than two (2) years, or has lived in an apartment for more than one (1) year but less than two (2) years

xx☒ 90 Day Notice — required if a tenant has a lease of at least two (2) years, or has lived in apartment for more than two (2) years.

You are further notified, and please TAKE NOTICE, that attached hereto and made a part hereof, is a copy of the New York State Good Cause Eviction LawaNotice-to-Tenant, as well as the Covid-19-related LIST (2-Pages) of Organizations Providing Housing Counseling & Services to Tenants Facing Eviction within the County of Suffolk, New York;

You are further notified, and please TAKE NOTICE, that a copy of this Notice is being mailed to the Community Development Corporation of Long Island ("Section-8") offices located at 1660 Walt Whitman Road, Suite #130, Melville, New York 11747, to the attention of Ms. Mildred Rivera, and that insofar as the result of any legal action in regard to your tenancy may affect your receiving continuing housing expense assistance, you are advised to contact your case-worker as soon as you receive this Notice.

Dated:
Tuesday, August 19th, 2025

[signature] Landlord

JOHN MANGINO, Owner/Landlord;
9 Heather Crescent, Commack, New York 11725; Agent
Telephone Number 631.499.5243 (jm)
Telephone Number 631.697.5683 Address
Telephone Number 631.948.5731 (wm)

Exhibit 6

* Use window envelope if mailed to tenant.
Use ordinary envelope if mailed to undertenant.

Attachment(s) : As noted herein-above;

# NOTICE TO TENANT OF APPLICABILITY OR INAPPLICABILITY OF THE NEW YORK STATE GOOD CAUSE EVICTION LAW

COPY

This notice from your landlord serves to inform you of whether or not your unit/apartment/home is covered by the New York State Good Cause Eviction Law (Article 6-A of the Real Property Law) and, if applicable, the reason permitted under the New York State Good Cause Eviction Law that your landlord is not renewing your lease. Even if your apartment is not protected by Article 6-A, known as the New York State Good Cause Eviction Law, you may have other rights under other local, state, or federal laws and regulations concerning rents and evictions. This notice, which your landlord is required to fill out and give to you, does not constitute legal advice. You may wish to consult a lawyer if you have any questions about your rights under the New York State Good Cause Eviction Law or about this notice.

The sending of this notice does not vitiate any prior litigation notices or pleading served upon you, nor does the sending of this notice serve to revive or reinstate any previously terminated tenancy. The word "tenant" as recited in the notice is solely for identification purposes and not a statement of legal status. No admissions or concessions of an owner right or remedy may be construed from the text or sending of this notice.

**NOTICE (THIS SHOULD BE FILLED OUT BY YOUR LANDLORD)**

UNIT INFORMATION

STREET:

374 Donald Avenue,

UNIT OR APARTMENT NUMBER:

CITY/TOWN/VILLAGE:

HOLBROOK,

STATE:

**NEW YORK**

ZIPCODE:

11741,

**IS THIS UNIT SUBJECT TO ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW?**
**(PLEASE MARK APPLICABLE ANSWER)**

_______ YES

__XX__ NO

2. **IF THE UNIT IS EXEMPT FROM ARTICLE 6-A OF THE REAL PROPERTY LAW, KNOWN AS THE NEW YORK STATE GOOD CAUSE EVICTION LAW, WHY IS IT EXEMPT FROM THAT LAW?**
**(PLEASE MARK ALL APPLICABLE EXEMPTIONS)**

A. __XXX__ Village/Town/City outside of New York City has not adopted good cause eviction under section 213 of the Real Property Law;

B. _____ Unit is owned by a "small landlord," as defined in subdivision 3 of section 211 of the Real Property Law, who owns no more than 10 units for small landlords located in New York City or the number of units established as the maximum amount a "small landlord" can own in the state by a local law of a village, town, or city, other than New York City, adopting the provisions of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law, or no more than 10 units, as applicable. In connection with any eviction proceeding in which the landlord claims an exemption from the provisions of Article 6-A of the Real Property Law, known as the New York State Good Cause Eviction Law, on the basis of being a small landlord, the landlord shall provide to the tenant or tenants subject to the proceeding the name of each natural person who owns or is a beneficial owner of, directly or indirectly, in whole or in part, the housing accommodation at issue in the proceeding, the number of units owned, jointly or separately, by each such natural person owner, and the addresses of any such units, excluding each natural person owner's principal residence. If the landlord is an entity, organized under the laws of this state or of any other jurisdiction, then such landlord shall provide to the tenant or tenants subject to the proceeding the name of each natural person with a direct or indirect ownership interest in such entity or any affiliated entity, the number of units owned, jointly or separately, by each such natural person owner, and the addresses of any such units, excluding each natural person owner's principal residence (exemption under subdivision 1 of section 214 of the Real Property Law);

C. _____ Unit is located in an owner-occupied housing accommodation with no more than 10 units (exemption under subdivision 2 of section 214 of the Real Property Law);

D. _____ Unit is subject to regulation of rents or evictions pursuant to local, state, or federal law (exemption under subdivision 5 of section 214 of the Real Property Law);

E. _____ Unit must be affordable to tenants at a specific income level pursuant to statute, regulation, restrictive declaration, or pursuant to a regulatory agreement with a local, state, or federal government

**FIFTH DISTRICT** COURT OF **SUFFOLK** COUNTY
STATE OF NEW YORK - **RONKONKOMA PART**

| | |
|---|---|
| **JOHN MANGINO,**<br>**Petitioner/Landlord,**<br>- against -<br>**KYUNG L. TROTTER,**<br>Respondent(s)/Tenant(s).<br>Premises address :<br>374 Donald Avenue,<br>Five-room Apartment,<br>Holbrook, New York 11741. | **PETITION**<br>**Holdover - Dwelling**<br>***INDEX NUMBER***<br>**LT-1852-25/IS** |

**THE PETITION OF :** JOHN MANGINO , the owner(s) and the Landlord(s), of said premises, upon information and belief, shows that :

1. The undersigned Thomas S. Zawyrucha, Esq., is the attorney for the petitioner(s) in this proceeding.

2. The Respondent(s) **KYUNG L. TROTTER** is/are the Tenant(s) and/ or Respondents of the premises, described below, who entered into possession under a certain **written lease agreement first made on or about February 1st, 2023,** between Respondent(s) as tenants and the undersigned Petitioners as Landlords, continuing to even date as a month-to-month tenancy, and the named Respondent has continued in possession thereof to even date.

3. The Premises are described as follows: **the Five-room Apartment of the house located at : 374 Donald Avenue, Holbrook, New York 11741**. The premises are situated within the territorial jurisdiction of this Court.

4. **The term for which said premises were rented by Respondent(s) tenant(s), continued as a month-to-month term tenancy, to even date, except as terminated by notice on Sun., November 30th, 2025;**

5. Prior to the commencement of this summary proceeding, the required predicate notice(s), inclusive of the 90-Days Notice Terminating Monthly Tenancy, Dated : Tuesday, August 19th, 2025, were sent/served upon Respondents, both by Certified Mail, and/or by personal service at the premises sought to be recovered, together with the required NYS "Good Cause Eviction Law" Notices -to-Tenant(s), as required and/or applicable. Copies of the said Notice(s) are attached hereto and made a part hereof, together with the Affidavits of Service of said Notice(s).



Exhibit 7

6. Pursuant to said written lease agreement(s) there was due to the landlord from respondent tenant(s) portion of rent as follows

Dec 1st, 2025 $ 714.00

for a grand total of either rent and/or use & occupancy in the sum of **$ 714.00**; Respondents have defaulted in the payments thereof and the ***total of rent*** and/or ***fair use & occupancy*** in arrears is **$ 714.00**; ***This petition may be amended to add additional unpaid rents accruing since prior notices were served, representing unpaid rents from August 1st, 2025, and beyond, if and where applicable.***

7. The Premises are not subject to any Rent Controls or the Emergency Tenant Protection Act of 1974, as amended (ETPA), by reason of the fact that the building in which the Premises are located is in a community which has not adopted the ETPA.

8. Petitioner(s) lack information or notice of any address where the respondent(s) reside or are employed or have a place of business or principal office in the State of New York other than the address of the Premises sought to be recovered.

**WHEREFORE**, Petitioner(s) request final judgment : awarding possession of the Premises to the Petitioner(s)/Landlord(s); and the issuance of a warrant to remove respondent(s) from possession of the Premises; and a judgment for rent & fair Use & Occupancy in arrears against Respondent(s) tenant(s) for **$ 714.00**; and a judgment of at least **$ 1,500.00** for the attorney's fees of the petitioner(s); and the costs and disbursements of this proceeding.

Dated : Thurs., December 4th, 2025
Great River, New York 11739

x [signature]

**MR. JOHN MANGINO, Petitioner**
**by: Thomas S. Zawyrucha,**
**Esq., Attorney-at-Law,**
**15 Woodhollow Road Box 477**
**Great River, N.Y. 11739;**
**Telephone No. 631.277.3435**
**Telephone No. 631.948.5731**

New message

Inbox 1.7K
Unread
Starred

Sent
Drafts 221
Scheduled

Trash
Spam
Archive

Folders
More

Back

Starred Contact

PHRANER

# Move Out Packet

KLT
To: Delores · Sat, Sep 13 at 6:33 PM

Hi Ms. Phraner,

I received the move out packet. I'm assuming the landlord asked you to send it to me, or maybe it's procedure. In any case, I will not be moving out. The landlord cannot evict me because he's angry that he had to fix a boiler, that he is legally responsible to maintain. That's just not how landlord-tenant law works. So, I'm just letting you know that I won't be moving or returning the packet.

Also, in my last email I asked how I may obtain a copy of the finding, that he was in fact found at fault for the broken boiler. Can you please let me know if I can get a copy directly from the CDC. Your help is appreciated.

Thank you,

Kyung Trotter

Delores Phraner
To: me · Mon, Sep 15 at 7:56 AM

Good Morning,

Thank you for your recent email. I am writing to confirm that your message has been received.

At this time, please be advised that the landlord has not submitted any formal eviction documents. However, he has provided a 90-day **Notice of Non-Renewal of Lease**, which he is legally entitled to do. If you choose not to vacate the unit upon the lease's expiration, the landlord has indicated that he will initiate the eviction process at that point to regain possession of the property.

Regarding the inspection report you requested, I do not have access to those records. For further assistance in obtaining the inspection documentation, please contact the **Inspection Department** directly.

Inspections (Ryan): 631.597.0733

If you have any other questions or concerns, feel free to reach out.

Best regards,

Community Development Long Island
Home. Health. Opportunity.

**Delores Phraner**
Housing Specialist | Rental Assistance
Community Development Long Island
Phone: (631)-648-5088| (631) 471-1215 Ext: 3050

Exhibit 8

Starred Contact

New message

- Inbox 2.6K
- Unread
- Starred
- Sent
- Drafts 222
- Scheduled
- Trash
- Spam
- Archive
- Folders
- New Folder
- App Status
- Bryony
- CBP EMAILS
- CDC 1
- CDC RELEVANT E...
- Denials
- Important
- IMPORTANT
- Job Search
- Jobs
- JOBS
- JOBS APPLIED TO
- Law Barriers
- law schools
- Lawyer's Rejec
- New Folder
- Packages
- PHRANER
- Received 250
- Rejections
- Unroll.me
- YO ASS

## Re: HAP Contract and Lease

Delores Phraner Cc Bcc

Re: HAP Contract and Lease

Hello,

Thank you for this information. I'm a law student, but because it's so hard to get organizations to represent you, I'll likely have to do this out of pocket.

I haven't look it up yet on the website that you gave me, but if local law allows the HAP contract to run while there is no current lease, or it just continues, then my lease doesn't terminate until

Sent from Yahoo Mail for iPhone

On Tuesday, September 16, 2025, 09:38, Delores Phraner <dphraner@cdcli.org> wrote:

Good Morning,

I would like to clarify that the wrong information was given regarding the HAP contract for rent adjustments. That information was given from the prior administration plan. As per the current Administration Plan(7/2025). A HAP contract will remain in place as long there are no changes to lease regarding utility changes or family moving into a new unit. Thank you, ←

Community Development Long Island
Home. Health. Opportunity.

**Delores Phraner**

Housing Specialist | Rental Assistance

**Community Development Long Island**

Phone: (631)-648-5088| (631) 471-1215 Ext: 3050

|dphraner@cdcli.org | www.cdli.org

Fax: (631)214-2734

1660 Walt Whitman Road, Suite 130

Melville, NY 11747

Exhibit 9

To schedule a meeting with me please click the link: https://calendly.com/dphraner-cdcli/30min

confidential agreement between CDLI and the landlord, and it will remain so.

As for your lease, it is the responsibility of both the tenant and the landlord to ensure that a valid lease is in place each year, if that is what the landlord chooses. However, if a new yearly lease is not signed, the tenancy automatically converts to a month-to-month arrangement under standard leasing terms.

I also want to confirm that your landlord has chosen not to renew your lease, which is within his rights once your lease term has ended. If you choose not to vacate the unit and return the property to the landlord, he also has the legal right to initiate an eviction process to regain possession of the property.

Please let me know if you have any questions or need clarification regarding this matter.

Kind regards,

Community Development Long Island
Home. Health. Opportunity.

**Delores Phraner**

Housing Specialist | Rental Assistance

**Community Development Long Island**

Phone: (631)-648-5088| (631) 471-1215 Ext: 3050

|dphraner@cdcli.org | www.cdli.org

Fax: (631)214-2734

1660 Walt Whitman Road, Suite 130

Melville, NY 11747

Exhibit 10

executed.

With regard to the landlord choosing not to renew my lease, there is no lease to renew. In light of the landlord failing to execute a lease for nearly 3 years, while falsely certifying that he had and being paid under a non-existent HAP contract, I'm astonished that you would assert his purported "rights" for him, especially while consistently advising me to consult with an attorney, when issues have arisen in the past.

I asked for your help, but I see you have no interest in ensuring that I am treated fairly, in accordance with the HUD regulations.

Best regards,

Kyung L. Trotter

On Tuesday, November 4, 2025 at 09:05:35

AM EST, Delores Phraner <dphraner@cdcli.org> wrote:

Good Morning,

I would like to clarify that I did not confirm there was *no* HAP contract in place. What I did inform you is that the HAP contract is a confidential agreement between CDLI and the

**Community Development Corporation of Long Island Suffolk**
1660 Walt Whitman Rd 130
Melville, NY 11747
Phone: (631) 471-1215

November 25, 2025

Kyung L Trotter
374 Donald Blvd
Holbrook, NY 11741-3935

## NOTICE OF OVER-HOUSING

Dear Kyung L Trotter,

Participant Log #: 0276958

Based on the subsidy standards for the Housing Choice Voucher Program, your voucher size is for a 2 bedroom unit, but you are currently living in a 3 bedroom unit. This means that your family is over-housed, or lives in a home larger than is allowed. You must make arrangements to move to a 2 bedroom unit immediately. If a 2 bedroom unit is not available in your housing complex, you must submit the following certification from your landlord within 10 business days. If you have any questions, please contact me at (631) 648-5088 or dphraner@cdcli.org.

Sincerely,

Delores Phraner

### LANDLORD CERTIFICATION OF UNITS AVAILABLE

HCV Participant: Kyung L Trotter
Log #: 0276958

Owner: John Mangino
Owner #: 0014079

The above-referenced tenant is currently over-housed, or living in a unit larger than their family size allows. Please fill out the form below and return to the Community Development Corporation of Long Island Suffolk office within 10 business days.

☐ We **could not** offer a 2 bedroom unit to this family as of this date since it was not available. We will offer this family a 2 bedroom unit as soon as it is available and will notify your office.

☐ We **have offered** a 2 bedroom unit to this family, but the family chose to stay in their current unit.

| | | | |
|---|---|---|---|
| Owner/Property Manager Name | | Phone | |
| Authorized Signature | | Date | |
| Address | | | |

631.214.2134

Please fax to ~~(111) 111-1111-111111~~ within 10 business days of the date of this letter.

Document ID: 7895715



Exhibit 11

**the week of December 22nd to December 26th**

*Schedule a meeting with me here:* **Book Time with me**

**PLEASE TAKE NOTICE:** The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you receive this transmission in error, please contact the sender immediately and delete the material from any computer where it may reside.

---

**From:** kyung trotter <trotter.kyung@yahoo.com>
**Sent:** Monday, December 1, 2025 8:52 AM
**To:** Delores Phraner <dphraner@cdcli.org>
**Cc:** Wilma H <wilmah@cdcli.org>
**Subject:** Re: Follow-Up Regarding Lease Status and Required PHA's Action

You don't often get email from trotter.kyung@yahoo.com. Learn why this is important

Good Morning Ms. Phraner,

This email serves as a clear record that, as of today, December 1, 2025, CDCLI has taken no action to correct the fact that I have not been provided a lease by Mr. Mangino since

provided a lease by Mr. Mangino since January 2023. You previously confirmed this fact in this email chain.

On November 10, 2025, you stated that Ms. Hayes would contact me within 24–48 hours. As of today, I have received no communication from her, other than being informed that she scheduled an internal meeting for November 11, 2025.

Instead of taking steps to resolve the lease issue, you mailed me a "Notice of Over-Housing," dated November 25, 2025. I have attached it for reference. The notice states, in part:

"Your voucher size is for a 2-bedroom unit, but you are currently living in a 3-bedroom unit... You must make arrangements to move to a 2-bedroom unit immediately... If a 2-bedroom unit is not available in your housing complex, you must submit certification from your landlord within 10 business days..."

This notice reflects an attempted redetermination of my family unit size. Under federal law, such a determination requires proper notice and an opportunity for an informal hearing.

Under 24 C.F.R. § 982.555(a)(1)(iii), a participant family is entitled to an informal hearing when a PHA determines the family unit size under the subsidy standards.

Under 24 C.F.R. § 982.555(c)(1), the PHA must inform the family of the basis of the determination and of their right to request an informal hearing if they disagree.

I received no such notice. Rather, I received a

I received no such notice. Rather, I received a directive to "move immediately" and to obtain landlord certification within 10 days—even though CDCLI is fully aware that the landlord is attempting to evict me without legal process and without ever providing the required lease.

This creates the appearance that, instead of addressing the lease deprivation, CDCLI is issuing coercive and retaliatory directives that have the practical effect of assisting an illegal eviction.

Please cease all such actions.

If CDCLI intends to redetermine my family unit size, provide the notice required by 24 C.F.R. § 982.555, along with the explanation of basis and the required information regarding my right to an informal hearing.

Thank you,

Kyung L. Trotter

On Tuesday, November 18, 2025 at 08:48:45 AM EST, Delores Phraner <dphraner@cdcli.org> wrote:

process to which I am entitled, under federal and state law.

Thank you,

Kyung L. Trotter

On Wednesday, December 3, 2025 at 01:39:18 PM EST, Wilma H <wilmah@cdcli.org> wrote:

Hi Ms. Trotter,

We received your request about the lease. Per NYS HCR program rules, the public housing agency cannot require a private landlord to renew a lease. Lease renewal is a decision made solely between the landlord and the tenant.

However, we have received a copy of 90-day non-renewal notice issued by your landlord and this notice provides you with until February 1st, 2026, to vacate the unit.

Since the owner has chosen not to renew the lease the PHA cannot compel them to issue a new lease or continue tenancy.

At this time, you have several options:

- Seek legal advice: You may want to consult with an attorney or legal aid organization regarding the non-renewal notice and your rights under NYS tenant landlord law.
- Begin searching for another unit.

Exhibit 12

Delores has issued you a move out packet which allows you to begin searching for a new unit that accepts the housing choice voucher.

All other concerns and issues have been addressed directly by the assigned housing specialist.

If you have any questions, or need support during your move process, please feel free to contact Delores.

Thank you,

Community Development Long Island
Home. Health. Opportunity.

**Wilma Hayes (She/Her)**

Assistant Director of Suffolk County | Rental Assistance

**Community Development Long Island**

(631)-597-0759 Fax: (631) 648-5011|wilmah@cdcli.org |www.cdli.org

1660 Walt Whitman Road, Suite 130

Melville, NY 11747

**Please note: CDLI will be closed for**

3. Eviction cannot be discussed as though the tenancy were legally established. You wrote: "If your landlord has notified you of their intention for you to vacate the unit... they may proceed with legal action."
However, a landlord cannot "terminate" or "non-renew" a lease that does not exist, nor can CDCLI treat a notice as valid when the underlying tenancy has never been legally maintained in accordance with HUD requirements. This is precisely why I asked how CDCLI intends to rectify the absence of a written lease.

4. You still have not answered the only question that resolves this situation. Given that:
• CDCLI has continued the subsidized tenancy without a written lease since January 2024;
• is obligated to ensure that a written lease with a HUD addendum exists; and
• acknowledges that it cannot compel the landlord to execute one;
What is CDCLI's plan to bring this tenancy into compliance with federal law?

Until CDCLI answers that question directly, the regulatory violation remains unaddressed.

I look forward to your response,

Kyung L. Trotter

On Thursday, December 4, 2025 at 08:45:12 AM EST, Wilma H <wilmah@cdcli.org> wrote:

Ms. Trotter,

Thank you for your email regarding your concerns. I have reviewed the federal regulations you referenced, and I have highlighted them in blue for your convenience so you can review the full context. Please note that we are in compliance with both regulations as they pertain to the initial term of the lease for subsidized housing to begin.

Currently, it appears that you are on a month-to-month in this unit. If your landlord has notified you of their intention for you to vacate the unit and you choose not to leave, they may proceed with legal action. If legal action is pursued, you will ultimately be required to vacate the unit.

We can assist you with beginning the process of searching for a new unit. Alternatively, you may remain in the unit and go through the legal process with your current landlord; if that occurs, we will address the situation once we



Exhibit 12

receive the legal documentation.

I understand that you may not be satisfied with the responses we have provided, but we ask that you carefully consider your options as they are also regulations on evictions. Please also ensure you forward any documentation you receive from your landlord, especially any legal notices requiring you to vacate the unit to your assigned housing specialist.

Thank you and have a good day.

Community Development Long Island
Home. Health. Opportunity.

**Wilma Hayes (She/Her)**

Assistant Director of Suffolk County | Rental Assistance

**Community Development Long Island**

(631)-597-0759 Fax: (631) 648-5011|wilmah@cdcli.org |www.cdli.org

1660 Walt Whitman Road, Suite 130

Melville, NY 11747

**Please note: CDLI will be closed for the week of December 22nd to December 26th**

*Schedule a meeting with me here:* **Book Time with me**

**PLEASE TAKE NOTICE:** The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you receive this transmission in error, please contact the sender immediately and delete the material from any computer where it may reside.